THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* ANGELO A. MULE, Respondent.

Fourth Department, January 9, 1975.

*Edward C. Cosgrove, District Attorney (William E. Balthasar of counsel), for appellant.*

*Joseph Carlisi for respondent.*

MARSH, P. J. The People appeal from an order of Erie County Court which granted defendant's motion to suppress certain evidence obtained from a search of defendant's automobile.

Detective Sergeant Bambach of the Town of Amherst Police Department, testified at the hearing on defendant's motion to suppress that he and Detective Richard Dentinger arrived at 335 Capen Boulevard at 6:45 P.M. October 28, 1972 and parked in an unmarked vehicle on the opposite side of the street for the purpose of executing a search warrant signed by a Town Justice. The warrant provided for the search of 335 Capen Boulevard, describing it as a one-family, two-story house with white shingles and black trim occupied by Steven Farago, and also for the search of Steven Farago and for the seizure of marijuana. The supporting affidavit stated with respect to information obtained from a reliable informant:

"That I have received information in the past from said informant and the information has always proved reliable and true.

"That in January of 1972 said informant gave me information that led to the arrest of Daniel Parisi and Brian Leonard of 2251 Wehrle Dr. in the Town of Amherst for possession of dangerous drugs 6th degree, resulting in 170.56 of the C. P. L. adj. in contemplation of dismissal.

"That in June of 1972 said informant gave me information that led to the arrest of Joseph Gioia of 121 Orchard Walk Town of Amherst for possession of dangerous drugs 6th degree, resulting in 170.56 of the C. P. L.

"Said informant now states that on Sunday October 22nd, 1972 he was in 335 Capen Blvd. and he saw three big plastic bags of marijuana that Steven Farago had just got. On Wednesday October 25th 1972 said informant again was in 335 Capen Blvd. and again he saw marijuana in smaller plastic bags and Steven Farago told him it was good stuff. He stated that Steven Farago also told him that he was getting more grass in this week end."

Detective Bambach stated that while sitting in the vehicle waiting for other detectives to arrive with the search warrant he observed a tan Cadillac parked in the driveway of 335 Capen. He saw a man open the trunk which was facing Detective Bambach and load it with large plastic bags and a footlocker carried from 335 Capen, and the man then drove the car forward about 10 to 12 feet. At 6:55 P.M. Detectives Czechowicz and Hohensee arrived and knocked on the door of the house. A man later identified as defendant Angelo A. Mule answered the door, was shown the search warrant and advised of his *Miranda* rights. The detectives then commenced to search the house.

Detective Bambach questioned defendant while the other detectives were in the process of searching, and testified: "He then stated that the stuff we were looking for was not in the house, that it was in the car."

Detective Bambach testified further:

"Q. All right, Officer, then what did you do?

A. We then asked him if he would give us consent to search the tan Cadillac that was parked in the drive.

Q. All right. Now, I want to — what did you say then, Officer?

A. Well, he hesitated, he asked us if he had to give us the consent, he was told he did not have to.

Q. Who told him this, do you recall?

A. Detective Hohensee. • • •

Q. What was he told?

A. He was told he did not have to give his consent.

Q. Then, what did the defendant do? Did he hand you the keys to the car, or any such action?

A. He then said he would give us consent, and Detective Czechowicz wrote out a short consent form, and the defendant signed it and then gave us the keys.

Q. Did you see the defendant sign this consent form?

A. Yes, sir.

Q. All right • • • then what happened • • • ?

A. He then gave us the keys to the '65 Cadillac.

Q. And then what did you do?

A. We then searched the Cadillac, the trunk of the car, the interior, as well.

Q. What did you find, Officer?

A. We found a footlocker that had marijuana in it, kilos of marijuana.

Q. How much marijuana, do you recall?

A. Approximately, all together, what was in the plastic bags, and the footlocker and suitcase, a hundred and forty pounds."

The hand written consent states: "I, Angelo A. Mule, residing at 335 Capen Blvd., Amherst, N. Y. having been advised of all my legal rights did give Det. Sgt. Bambach of the Amherst Police permission to search my car, a 1965 Cadillac, NY Reg. EO 3195, on Saturday, Oct. 28, 1972 at 7:15 P.M.

Signed Angelo A. Mule
Witness: Det. Richard Czechowicz
Det. Sgt. William K. Bambach "

On cross-examination Detective Bambach testified that they were parked about 60 feet from the Cadillac when the loading of the plastic bags and footlocker was observed prior to the execution of the warrant for search of 335 Capen. During the search of the house the only thing found was a small plastic bag inside of a box containing a small amount of vegetable matter. The search of the automobile occurred approximately 20 minutes after the detectives entered 335 Capen. At no time prior to signing the consent did defendant ask to see an attorney.

Detective Czechowicz testified that he informed defendant that he was going to write out a consent form for his signature; that he did so and defendant signed it. Czechowicz heard Detective Bambach tell defendant that he did not have to sign it. Steven Farago, the occupant named in the search warrant, was not present when the consent form was signed.

Defendant Mule testified that he resided at 335 Capen on October 28, 1972 with Steven Farago and Kenneth Syracuse. At about noon on the 28th of October he was preparing for a Halloween party and he proceeded to his brother Frank's house in the tan Cadillac to pick up a bar. He returned to 335 Capen at approximately 5:55 P.M. His roommate Steven Farago and Kenneth Syracuse then left the house to pick up their Halloween costumes. At approximately 6:10 P.M. he proceeded to his brother Carl's house at 239 Cortland Avenue, Town of Tonawanda, arriving at about 6:20 P.M. His sister-in-law, Laura, was there when he arrived and his brother Carl arrived home at 6:30 P.M. He left his brother Carl's home at about 6:50 or 6:55 P.M. and returned to 335 Capen at approximately 7:10 P.M. There was no one there at the residence. He cleaned out the garbage cans and, while changing some Halloween decorations, the police arrived.

The police entered the house, showed defendant the search warrant, gave him his *Miranda* rights and proceeded to search defendant and the premises. Detective Dentinger stated to defendant that he found some marijuana residue in the kitchen garbage. He then announced to defendant, "You are now busted", and defendant assumed from that moment on that he was under arrest. Defendant asked to call a lawyer and was told that he could call one later. Detective Dentinger took defendant's car keys which he had placed on the table and went out the door. Defendant asserted that he did not at any time put any large plastic bag or footlocker in the trunk of his car. Detective Dentinger came back into the house and said that he had found marijuana in defendant's trunk. Defendant

asserted that the detectives said that they had a right to search everything on the premises and threatened to arrest all of defendant's friends as they arrived at the party. The defendant testified that they did not in so many words say, however, that the search warrant gave them the right to search the car. He further testified that not until 10 minutes after the automobile was searched was he requested to sign the consent to the search. He indicated a hesitancy and requested to see his lawyer, but was told that it was only a formality. He testified that he was signing the consent when Steven Farago walked into the dining room.

Laura Mule, defendant's sister-in-law, testified that she lived at 239 Cortland Avenue, Town of Tonawanda, and saw defendant between 4:30 to 4:45 P.M. on October 28, at which time he had a bag of laundry and a puppy with him. He left her house at 6:55 P.M., about 25 minutes after her husband arrived home.

Farago, defendant's roommate since July, 1972, testified that he left 335 Capen Boulevard October 28, 1972 with Syracuse and another in order to obtain a Halloween costume, at about 5:25 P.M., arriving back at 7:15 P.M. As he walked up the driveway he saw a green car and defendant's car with the trunk open. Plastic bags and a black box were in the trunk of the green car. He was met by two policemen and asked for his identification. He noticed defendant was signing a paper when he walked in, and before defendant left he informed Farago that the paper which he had signed was a consent for a search. Just prior to defendant's leaving, Farago had seen him sign an inventory sheet of the property seized. Defendant told Farago that the police threatened to arrest everybody who came to the party unless defendant co-operated, but did not specifically state that the threat related directly to the request to sign the consent.

The People do not attempt to justify the search of the car as coming within the permissible scope of the search warrant, and rightly so (People v. Rainey, 14 N Y 2d 35; People v. Dumper, 28 N Y 2d 296). Instead, the People justify the search upon the basis of independently established probable cause for the search of the vehicle and also upon the express consent of the defendant, both verbally and in writing.

The probable cause justification consists of the observations by Detectives Bambach and Dentinger of defendant loading the three plastic bags and the footlocker into the trunk of his tan Cadillac only 60 feet from their line of sight. This observation was made in conjunction with the information of the reliable

informant that within three days previously the informant had noticed two large plastic bags full of marijuana at 335 Capen Boulevard and had been told by Farago that they were obtaining more good stuff over the weekend. Coupled with this observation and the information supplied by the informant, defendant himself stated to Detective Bambach that it was no use searching the house further, since the marijuana was in the trunk of the tan Cadillac. This information provided probable cause for a belief by the officers that defendant's trunk contained contraband, and it provided justification for the search (*People* v. *Tolentino,* 40 A D 2d 596) unless it is held that the officers were required to obtain a search warrant before proceeding with the search.

It is generally held that an automobile may be searched under circumstances which would not justify a warrantless search of a residence.

"Automobiles, because of their mobility, may be searched without a warrant upon facts not justifying a warrantless search of a residence or office. *Brinegar* v. *United States,* 338 U. S. 160 (1949); *Carroll* v. *United States,* 267 U. S. 132 (1925). The cases so holding have, however, always insisted that the officers conducting the search have 'reasonable or probable cause' to believe that they will find the instrumentality of a crime or evidence pertaining to a crime before they begin their warrantless search." (*Dyke* v. *Taylor Implement Co.,* 391 U. S. 216, 221.)

No different result should obtain with respect to the instant case because the automobile was first observed parked in the driveway at 335 Capen Boulevard rather than having been stopped upon the open highway. In *Chambers* v. *Maroney* (399 U. S. 42) the Supreme Court considered the validity of a probable cause search without a warrant of an automobile originally stopped on the highway, but not searched until it was driven to the police station. The court held the search valid, reasoning that the same probable cause for the immediate highway search continued to obtain once the vehicle arrived at the station house. (See, also, *People* v. *Fustanio,* 35 N Y 2d 197.) The constitutional intrustion resulting from the warrantless search at the station house, albeit based on probable cause, was no greater than an immobilization of the vehicle by the police authorities until a warrant could be obtained. The court went on to reject a requirement that the police authorities permit the vehicle to leave their custody pending the obtaining of the warrant, for, given the vehicle's mobility, it could leave the jurisdiction of the court issuing the warrant before the warrant could be

obtained and executed. Consideration was also given to the difficulty of maintaining a police surveillance of the vehicle pending execution. Hence, as a practical matter, faced with the choice of permitting police custody pending the obtaining and execution of a warrant and an immediate search, the court concluded that the one was as great an invasion of Fourth Amendment rights as the other. Thus, given probable cause and the exigent circumstance pertaining to the mobility of an automobile wherein the contraband was reasonably believed to be, a search without warrant was constitutionally permissible.

"Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorized the 'greater'. But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

"On the facts before us, the blue station wagon could have been searched on the spot when it was stopped since there was probable cause to search and it was a fleeting target for a search. The probable-cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured. In that event there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained. The same consequences may not follow where there is unforeseeable cause to search a house. Compare *Vale* v. *Louisiana* [399 U. S. 30]. But as *Carroll, supra,* held, for the purposes of the Fourth Amendment there is a constitutional difference between houses and cars." (*Chambers v. Maroney,* 399 U. S. 42, 51–52, *supra.*)

The search in the instant case having been amply justified on the basis of probable cause and the target of which is a fleeting one, the doctrine of exigent circumstances expressed in *Chambers* v. *Maroney* and cases cited therein authorizes the instant search without a warrant. (See *People* v. *Singleteary,* 35 N Y 2d 528.)

The second independent justification for the search rests upon the consent both orally and written granted by the defendant to the Amherst Police. The testimony of Detectives Bambach and Czechowicz tended to establish both an oral and a written consent prior to the actual search of defendant's trunk. Not only did the officers, according to their testimony, request defendant's consent, they even advised him that he need not give his consent, and according to defendant, they did not assert that the search warrant permitted a search of the vehicle. The prosecution has the burden to establish the free and voluntary nature of a consensual search. However, there is no requirement that they advise the target of a search that he has a right not to allow the search. Such lack of advice is merely one factor to be considered within the totality of the circumstances when assessing the voluntary nature of the consent (*Schneckloth* v. *Bustamonte*, 412 U. S. 218). If we credit the testimony of the police officers, the totality of the circumstances indicates that the consent was given freely and voluntarily.

The cases cited by defendant with respect to consents given following the execution or attempted execution of a warrant are inapposite. In *Bumper* v. *North Carolina* (391 U. S. 543) the officers appeared at defendant's residence and presented a search warrant for the search of the residence of defendant's grandmother. The search was then conducted after the grandmother said, " go ahead ". The State later attempted to justify the search, not upon the basis of the warrant but upon the consent of the grandmother when faced with the warrant. The court held that the consent, if such it was, was completely tainted by the constraint implicit in the assertion that the officers had a warrant and would search the place irrespective of the consent of the grandmother. In the instant case, the officers did not assert a right to search the Cadillac, and even defendant did not testify that they asserted such a right under the authority of the search warrant directed to the residence. The Court of Appeals has held that a valid consent to search may be granted even though the search target is under arrest at the time of the consent (*People* v. *Rodriguez*, 11 N Y 2d 279; see, also, *Hoover* v. *Beto*, 439 F. 2d 913, 920). Defendant Mule, according to the police officers, was not under arrest at the time the consent was given. The mere fact that he was a subject of the search by virtue of his presence in the residence during its search, is not sufficient in itself to render the consent invalid.

County Court granted the suppression motion upon the basis of the wording in the written consent and upon his impression

of the testimony that no oral consent had been given. The testimony of Detective Bambach establishes both an oral and written consent prior to the search of the trunk. The fact that the written consent used the words, "did consent" as opposed to "does consent" does not establish that the consent was executed subsequent to the search. The police officers were probably reflecting the fact that the oral consent which in and of itself would have constituted justification for the search, was granted prior to the writing which was merely a memorialization of the oral consent. The use of the word "did" in the context of the testimony has no probative force suggesting that the consent was granted subsequent to the search, as testified to by defendant and Farago. If defendant would sign a consent to search his vehicle as a mere formality after the search, it seems just as probable that he would sign a consent to the search prior to its inception. The testimony of the police officers appears cogent, persuasive and lacking in any inherent contradiction and should be accepted.

Based upon the testimony of the People's witnesses on the suppression hearing, a proper justification for the search has been established upon probable cause and by virtue of a free and voluntary consent.

The order appealed from should be reversed, defendant's motion to suppress denied.

WITMER, SIMONS, MAHONEY and GOLDMAN, JJ., concur.

Order unanimously reversed and motion denied.