THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JON MERRITT JONES, Respondent.

Fourth Department, February 18, 1977

*Paul M. King, District Attorney (Alan Marrus* of counsel), for appellant.

*Doyle, Diebold, Bermingham & Gorman (Joseph D. Bermingham, Jr.,* of counsel), for respondent.

MARSH, P. J. The People appeal from an order of County Court, Chautauqua County, which granted defendant's motion to suppress certain materials seized from his automobile.

James V. Burns, a State trooper, testified at the suppression hearing that he received a call at approximately 2:30 A.M. on October 3, 1974 to investigate a fatality on Route 17 south of Bemus Point. At the scene a red Maverick was found which was registered to a Mr. Straight, husband of deceased Patricia Heyduk's mother. Investigation revealed blood on the pavement and on the shoulder of the road. He learned that sometime the preceding night a Ford, bearing Colorado plates, had been in the vicinity of the place where the body was found. Trooper Burns also learned from deceased's mother that on the preceding night deceased was with defendant Jones at a nighclub known as Digie's. He also ascertained from a Mrs. McCauley who worked in a coffee shop at Bemus Point that Mrs. McCauley's son, Ron McCauley, had mentioned to her that he had driven by the area of Bellview Heights and saw two cars parked there, a light colored car with out-of-State license plates and a dark car.

Trooper Burns then proceeded to defendant's place of employment on the morning of October 3, 1974 at the offices of A.V.M., accompanied by Trooper Barush. Trooper Burns informed defendant that the police were investigating the death of Patricia Heyduk and had information that defendant was the last person to see deceased alive, that defendant knew her and that he was a material witness in the investigation and might become a suspect; and that if he became a suspect he would be advised of his rights. During this portion of the interview the defendant said that he had been in touch with an attorney. From his conversation with him the trooper concluded that defendant had known Patricia Heyduk was dead. Defendant was then given the *Miranda* warnings. Defendant stated that he met deceased at the Four O'Clock Club in Jamestown. Defendant and deceased then proceeded to

Digie's Bar. They there met deceased's mother and stepfather, had a few drinks and left Digie's at approximately 1:15 to 1:30 A.M., returning to deceased's vehicle parked at the Four O'Clock Club. Defendant and deceased talked of going to defendant's home on Lakeside Drive in Bemus Point but defendant stated that he had an early business meeting and did not want deceased to come over to the house that night. Deceased was quite insistent upon coming over to defendant's house, and so she followed defendant out to the Big "N" Plaza on Fluvanna Avenue, but defendant lost deceased in the heavy traffic on that avenue. He last saw her before he proceeded out Route 17. He did slow down in the Bellview Heights area and looked in the rear view mirror but did not see deceased, and so defendant then proceeded to his residence. The defendant claimed that deceased followed him in the red Maverick.

Trooper Burns advised defendant that it was routine to check vehicles close to a death scene and stated that he would like to check defendant's car but he did not have a written consent form handy. This discussion took place in the office of the A.V.M. plant. Defendant indicated that he owned a 1971 Ford two-door, yellow colored, with a green license plate embossed with white numerals; and that the vehicle had been in his possession since early evening of October 2. Defendant gave his consent to the officers' looking at the vehicle, and Trooper Barush, Trooper Burns and defendant proceeded to defendant's vehicle in the company parking lot. Trooper Burns, looking over the wheel well area and along the lower right front fender, observed a couple of small red specks. He then requested defendant to proceed with him to a gas station where he could put the vehicle on a lift and examine it closer. Defendant drove the vehicle over to Art's Friendly Service and Trooper Burns rode in the passenger side. At Art's Friendly Service Trooper Burns examined the under part of the vehicle with an extension light and saw some foreign matter on the car that called for examination by more competent, professional help. He observed substances inside the wheel well and the undercarriage that looked like hair, blood and fibers. At this point Trooper Burns advised defendant that he was going to impound the vehicle. Defendant was permitted to contact his lawyer, and Trooper Burns spoke to the lawyer and assured defendant's lawyer he would not discuss the case further with defendant. The vehicle was then transported on a flatbed truck to the police barracks at Falconer.

A police chemist, Paul Daub, examined the vehicle at the Levant Gulf Station under photographic lights and removed suspected fibers, hair and blood material. Pubic hair was also found on the transmission undercarriage.

Trooper Ronald Barush testified that defendant stated that it was unnecessary to have a written consent form as it was all right for the troopers to look at defendant's car, that such inspection posed no problem. Defendant offered no testimony at this suppression hearing.

The burden is on the People to establish that defendant freely and voluntarily consented to the search of his vehicle *(People v Mule,* 46 AD2d 414); however, defendant need not be advised that he has a right not to allow a search *(Schneckloth v Bustamonte,* 412 US 218). It must be established that the consent was not a product of defendant merely submitting to an official show of police authority *(Bumper v North Carolina,* 391 US 543; *People v Gonzalez,* 39 NY2d 122).

The discussion concerning the involvement of defendant with the death of deceased took place in defendant's place of employment. The request to look at defendant's vehicle parked in the company parking lot was made subsequent to a discussion concerning the details of defendant's evening with the deceased, which narration by defendant established that he may have been one of the last persons to see deceased before her death. He was also placed at the scene near the time of death by his own admission and the statement of a witness who saw a car the color of his with out-of-State plates. It is most probable that he was anxious not to appear suspicious, and hence freely granted permission to examine his vehicle as testified by Troopers Burns and Barush. He offered no rebuttal to the People's evidence of consent. He was not under arrest, and the atmosphere as established by the suppression hearing record was not instinct with coercion *(People v Gonzalez, supra).* The People have established that defendant's consent to examine his vehicle at the parking lot and at Art's Friendly Service was freely and voluntarily given *(People v Mule, supra).*

A review of the pertinent facts known to Trooper Burns when he investigated defendant's vehicle in the A.V.M. parking lot reveals adequate grounds in any event for seizing defendant's vehicle without a warrant. Given the information transmitted to him and his own observations, Trooper Burns had reasonable grounds to believe that defendant was impli-

cated in the death of Patricia Heyduk, and defendant's vehicle was an instrumentality of that crime.

In *Cardwell v Lewis* (417 US 583) the Supreme Court held that the Ohio police had reasonable grounds to believe that defendant Lewis was involved in the homicide of an accountant named Radcliffe. Radcliffe had been checking defendant Lewis' books in order to make a report to one Smith who had a contract to buy defendant Lewis' business. On the afternoon of July 19, 1967 Radcliffe's body was found near his car on the banks of the Olentangy River in Delaware County, Ohio. The body was found in the bush near his car which had gone over the embankment. Casts had been made of tire tracks at the scene and paint scrapings were obtained from the fender of Radcliffe's automobile. An automobile similar to defendant's had been observed leaving the scene of the homicide. The color of defendant's vehicle was the color of the paint scrapings. Someone had made a call to the purchaser's wife in the early morning of July 19. The caller identified himself as Radcliffe and stated that Lewis' books were in A-1 condition. Mrs. Smith, however, knew Radcliffe and realized the caller was impersonating him. A notation on Radcliffe's desk calendar, which was brought out from an impression, stated, "Call Ben Lewis".

Defendant Lewis was arrested pursuant to an arrest warrant on October 10 at the office of the Division of Criminal Activities. Defendant was interrogated from around 10:00 A.M. on that day until late afternoon. Two hours prior to his arrest he was permitted to call his attorney and two attorneys were present at the Criminal Activities office when the arrest was effectuated. He had parked his vehicle in a public commercial parking lot about one-half block away. The police towed defendant's car to the police impoundment lot and it was examined the next day by a technician from the Ohio B.C.I. The track of the right rear tire matched a track impression made at the scene of the crime and the paint taken from Radcliffe's fender was found to match a paint scraping taken from defendant's car. Defendant had asked one of his attorneys to see that his wife and family got the car and the attorney only relinquished the keys to the police in order to avoid a physical confrontation.

The Supreme Court noted that nothing from the interior of defendant Lewis' vehicle and no personal effects were searched or seized. The search was limited to an examination

of the tire and paint scrapings from the exterior of the vehicle. The court then stated: "With the 'search' limited to the examination of the tire on the wheel and the taking of paint scrapings from the exterior of the vehicle left in the public parking lot, we fail to comprehend what expectation of privacy was infringed. Stated simply, the invasion of privacy, 'if it can be said to exist, is abstract and theorectical'. * * * Under circumstances such as these, where probable cause exists, a warrantless examination of the exterior of a car is not unreasonable under the Fourth and Fourteenth Amendments." *(Cardwell v Lewis,* 417 US 583, 591-592.)

The remaining facet of the Fourth Amendment claim concerned the prior seizure of the Lewis vehicle before its close examination by police technicians. "Concluding, as we have, that the examination of the exterior of the vehicle upon probable cause was reasonable, we have yet to determine whether the prior impoundment of the automobile rendered that examination a violation of the Fourth and Fourteenth Amendments. We do not think that, because the police impounded the car prior to the examination, which they could have made on the spot, there is a constitutional barrier to the use of the evidence obtained thereby. Under the circumstances of this case, the seizure itself was not unreasonable." *(Cardwell v Lewis, supra,* pp 592-593.)

It was necessary, the Supreme Court reasoned, for the Ohio police to seize the vehicle immediately as the exigent circumstances which justified a warrantless seizure in *Chambers v Maroney* (399 US 42) existed to a greater degree in *Cardwell v Lewis.* The Lewis car constituted highly incriminating evidence and the potential and incentive for disposing of such evidence were great. In addition, the Supreme Court in *Lewis* states (p 595): "Here too, the seizure facilitated the type of close examination necessary."

It was necessary for Trooper Burns to seize the vehicle in the parking lot, if, indeed, seizure at that point took place, in order to make a closer examination at Art's Friendly Service. The examination at Art's Friendly Service confirmed his belief that defendant Jones was implicated in the automobile homicide of deceased Patricia Heyduk. In accordance with the reasoning of the Supreme Court in *Cardwell v Lewis (supra),* the facts known to Trooper Burns from conversations with witnesses, the defendant and the observations of the red specks along the wheel well and blood on the pavement

provided probable cause justifying the seizure and examination of the 1971 Ford.

We would conclude that defendant consented to the examination of his vehicle at Art's Friendly Service as well as at the parking lot. Even assuming that defendant gave no consent, the observations by Trooper Burns of the defendant's vehicle in the A.V.M. parking lot did not require defendant's consent as it did not amount to a search within the meaning of the Fourth Amendment *(Cardwell v Lewis, supra)*. Based upon this inspection and the facts at hand, Trooper Burns had reasonable grounds to believe that defendant and his vehicle were implicated in the death of Patricia Heyduk; hence the seizure and examination of defendant's vehicle violated no Fourth Amendment right *(Cardwell v Lewis, supra)*.

The suppression order should be reversed and defendant's motion denied.

SIMONS, DILLON, GOLDMAN and WITMER, JJ., concur.

Order unanimously reversed and motion denied.