Jasen, J.
In each of these cases, we are Called upon to consider, for the first time, the . propriety of predeparture searches of passengers at airports. Each of the defendants, claims that the. airport security measures in úse, at the time of his arrest, violated his rights under the Constitution, particularly the Fourth Amendment.
Defendant Buongermino was convicted, upon his plea of guilty, of attempted criminal possession of a dangerous • drug* in the Criminal Court of the City of New York, and was conditionally discharged. On appeal to the Appellate Term of the Supreme Court, the judgment of conviction was affirmed,-without opinion.
The record discloses that on the afternoon of May 6,1972, uniformed United States Customs Security Officers were conducting predeparture Clearance of approximately 150 passengers- át a boarding gate : at the Kennedy International Airport, in the area, signs,. 18 inches by 24 inches, were posted, notifying boarding passengers that they were súbject to searches. In addition, public announcements were made from time , to time that passengers were subject to search before boarding planes. About 100 individuals preceded the defendant in line, waiting.for clearance to board the airplane. As the passengers filed, past *207 the security officers, all males were stopped and frisked. Eventually, the defendant was asked by one of the security officers “if he would mind being searched ”, and he replied “ no ”. As the security officer patted-down the defendant, the officer felt ‘ ‘ a large bulge in his right rear pocket ’ ’. The officer asked the defendant to “ remove the bulge ”, whereupon defendant handed over a clear plastic package containing a substance subsequently determined to be marijuana. Buongermino was then placed under arrest.
Defendant Kuhn was convicted of criminal possession of a hypodermic instrument (Penal Law, § 220.45) in the Criminal Court of the City of New York and was sentenced to three months imprisonment. The Appellate Term of the Supreme Court unanimously affirmed the conviction, without opinion.
The record reveals that on December 1, 1971, Kuhn arrived at LaGuardia Airport, intending to board an Eastern Airlines flight to Florida. Before boarding, he went through a magnetometer[1] and “ triggered ” it. An airlines agent then requested Kuhn to show identification, whereupon Kuhn produced a letterhead and “ perhaps a Social Security card ”. Since the papers presented did not show an address or give Kuhn’s physical description, the agent asked “ if he would consent to a search of his person before boarding the aircraft ”, “if he would submit to a voluntary search by United States Deputy Marshal ”, and Kuhn replied “ yes ”. The Deputy Marshal who was standing alongside the airlines agent proceeded to pat-down Kuhn, and upon feeling something in his right front pants pocket, asked Kuhn to “please reveal what he.had in his pocket ’ ’. Kuhn took a cigarette package from Ms pocket, wMch was “ rolled ” and had a rubber band around it. Feeling something hard inside the package, the deputy opened it and found a hypodermic syringe, a bottle cap and an eye dropper. A further search of defendant yielded two envelopes later determined to contain heroin.
*208 The threshold question in both cases is whether the defendants voluntarily consented to the search leading to their arrest and conviction. If they did, the searches were constitutionally permissible since a defendant may waive his Fourth Amendment constitutional rights and consent to a search. (Davis v. United States, 328 U. S. 582; Zap v. United States, 328 U. S. 624.) Although “ the burden of proof rests heavily upon the People to establish the voluntariness of [the] waiver of a constitutional right ”, (People v. Whitehurst, 25 N Y 2d 389, 391; see, also, Bumper v. North Carolina, 391 U. S. 543), the question of establishing a voluntary consent is one of fact (Schneckloth v. Bustamonte, 412 U. S. 218).
In our view, the record in each case discloses that the prosecution has sustained its burden of establishing a voluntary consent. This conclusion is based not only upon the undisputed evidence that each of the defendants consented to the search but also upon the fact that we find no evidence of any inherently coercive tactics by the security officers in screening the defendants — either from the nature of their questions or the environment in which it took place. In addition, there is no showing that there was any official compulsion in the manner of the security officers in requesting permission to search the defendants. The fact that uniformed security officers asked the questions does not alone make the interrogation suspect or coercive. The security officers did not arbitrarily select the defendants for screening prior to departure, but followed, in each instance, the same.procedure as to all prospective passengers.
In the Buongermino case, the defendant was screened after waiting in line while approximately 50 other male passengers who preceded him were frisked for weapons in full view of the other passengers in line. As to Kuhn, the procedure used in screening him was also uniformly applied to all prospective passengers in requiring passage through a magnetometer before boarding the plane. It was only after Kuhn “ triggered ” the device that he was asked if he would submit to a search, and, again, this procedure applied to all prospective passengers “ triggering ” the device, and not only to Kuhn. -
Defendant Buongermino also argues, that his consent to be searched cannot be considered a free and voluntary one in view *209 of the failure of the security officer to inform him of his right to refuse the search. This argument was recently considered and rejected by the United States Supreme Court in Schneckloth v. Bustamonte (supra). In a lengthy opinion by Justice Stewart, the court, in discussing the question of voluntariness of consent to a search, said:11 Voluntariness is a question of fact to be determined from all the circumstances, and while the subject’s knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a i prerequisite to establishing a voluntary consent.” (Id., at pp. 248-249.) In distinguishing between consent and waiver, the court went on to say that u a knowing and intelligent waiver ” is only required when a defendant purportedly waives ‘ ‘ rights which the Constitution guarantees ■to a criminal defendant in order to preserve a fair trial ” (id., at p. 237), and that consent in a Fourth Amendment context need not be tested by the “ knowing and intelligent ” requirement since the protection of the Fourth Amendment has “ nothing whatever to do with promoting the fair ascertainment of truth at a criminal trial.” (Id., at p. 242.)
The issue of the use of the magnetometer, as a passenger screening device, has also been raised. While the magnetometer constitutes a search in the constitutional sense, its use involves a minimal intrusion requiring the traveler to simply walk through the device without any physical contact. There is no restraint and it is not intrinsically offensive. Moreover, passage through a magnetometer is far less intrusive than a thorough pat-down or frisk of the body. (Terry v. Ohio, 392 U. S. 1.)
The question then arises whether the intrusion is a reasonable one under the circumstances. In determining the reasonableness of the intrusion, it should be tested by “ balancing the need to search against the invasion which the search entails. ’ ’ (Camara v. Municipal Ct., 387 U. S. 523, 537.) The nature of the harm sought to be prevented includes air piracy and the severe consequences which aircraft hijackings produce. In order to prevent the possibility of a hijack attempt, immediate “ on the spot ” protective action by airport officials is required. There is no time to obtain a search warrant for each passenger *210 passing through the magnetometer. As a practical matter, obtaining a search warrant for each prospective passenger would be impossible and would frustrate the purpose of the search.
. The justification of magnetometer searches must rest on the theory that permits warrantless searches of an entire class of persons, which includes some who may be potential hijackers. "Where, as here, the danger to the public is evident, the governmental interest so overwhelming, and the intrusion into personal privacy so minimal, we conclude that the use of a magnetometer to search a prospective passenger is reasonable and constitutionally permissible.
We do not hold, however, that once the magnetometer is “ triggered ”, indicating the presence of metal upon a person, a further personal' search or frisk of the passenger is authorized unless it can be shown that the passenger consents to such search. Failing to consent to a further search at this point would, of course, bar him from boarding the plane. Since the sole purpose of the airport security measures is to prevent air piracy, there is no need to further search such a prospective passenger, as he will not be permitted to board the plane and no longer represents a threat as a potential hijacker.
Finally, the contraband which constituted the basis for defendants’ prosecution was discovered during a search for weapons. The United States Supreme Court has recognized, as indeed has this court, that contraband seized during the course of a properly conducted search is admissible in evidence. (Chimel v. California, 395 U. S. 752; People v. Sullivan, 29 N Y 2d 69; People v. Gallmon, 19 N Y 2d 389.)
The orders appealed from should be affirmed.
Chief Judge Fuld and Judges. Burke, Breite'l, G-abrielli, J ones and Wachtler concur.
In each case: Order affirmed. .

.. A magnetometer is an electronic device that can be tuned to detect various amounts of ferrous metal. It cannot, however, distinguish a concealed weapon from an “ innocent ” iron or steel item of like mass, nor can it detect weapons made from alloys that do not disturb the earth’s magnetic field. (See Wahl, How Science Will Foil the Skyjackers, 97 Popular Science 58 [Nov., 1970], describing the magnetometer and how it operates.)