Chief Judge Breitel.
The exclusive issue is whether in a criminal action defendants’ written consents to search their apartment were involuntary as a matter of law, as indeed the Appellate Division concluded.
Defendants, after denial of their motions to suppress drugs uncovered and seized under the consents, were convicted upon their pleas of guilty of possession of drugs (Penal Law, § 220.16). The Appellate Division unanimously reversed their convictions, on the law, vacated their pleas, granted defendants’ motions to suppress the drugs seized, and remanded to Supreme Court for further proceedings. The People appeal.
There should be an affirmance. Consent to search, a relinquishment of constitutional protection under both the Federal and State Constitutions against unjustified official intrusion, must be a free and unconstrained choice. Official coercion, even if deviously subtle, nullifies apparent consent. Whether consent has been voluntarily given or is only a yielding to overbearing official pressure must be determined from the circumstances. Where, as here, the circumstances objectively reveal overbearing official conduct in obtaining an apparent consent, there is, as the Appellate Division concluded, a question of law, and an absence of voluntary consent. Contraband seized as a result of the search must, therefore, be suppressed, because on no view of the evidentiary facts was there an exercise of free will in the giving of the consents.
In viewing the record, because the issue comes to this court solely on a question of law, the evidence, but only the actual evidence, given by the prosecution witnesses must be assumed to be entirely creditable, together with any admissions by defendants. The contrary and largely plausible version given by the defense witnesses detailing an entirely different account of the relevant events must be disregarded. Despite the obvious temptation to describe that version, it will not be set forth except for an occasional reference where the prosecution’s version is demonstrably uncreditable as contrary to human experience and the context in which the events in question occurred.
On September 17, 1973, Agent Michael Horn of the United States Drug Enforcement Administration, while negotiating a prospective drug sale, received a "sample” of cocaine from *125 Joseph Gonzalez in the bedroom of his small, three-room Castle Hill apartment in the northern part of New York County. Gonzalez took the cocaine from a clear plastic bag on top of the bedroom dresser. Present in the bedroom at the time of the transaction was Mr. Gonzalez’ bride of three days, Tracy. Both Gonzalezes were under 20 years of age.
A few minutes after leaving the apartment, Agent Horn returned with another Federal agent, Hochman, to arrest Mr. Gonzalez for the initial sale and for possession of drugs and Mrs. Gonzalez only for possession. The agents came upon Mr. Gonzalez in the hallway outside his apartment. They identified themselves and Agent Hochman drew his weapon. When they tried to arrest him, Gonzalez resisted and a brief struggle ensued. During the struggle, Agent Hochman and Gonzalez fell down a flight of stairs and the agent’s gun was dropped. Also during the struggle, Gonzalez shouted to his wife to "lock the door [or] something like that”. Gonzalez was finally subdued by the agents, now assisted by a third agent, and his arms were handcuffed behind his back.
Agents Horn and Hochman then knocked on the apartment door and identified themselves. When no immediate response was forthcoming, the agents banged and kicked the door. At this point, six other agents arrived, now an aggregate of nine. After about five minutes Mrs. Gonzalez opened the door and was immediately handcuffed and placed in the bedroom by the agents. (At the suppression hearing she admitted that, during the interval, she had been disposing of drugs.) Mr. Gonzalez was brought in by Agent Jenkins and placed in the living room.
Nine Federal agents were now in the small apartment with the handcuffed and separated Gonzalezes. Some of the agents began their "standard procedure” of checking closets for possible other occupants of the apartment. No otherwise full-scale search for contraband was conducted. After the visual search, two agents left to check the area below the apartment windows, and two others went outside the apartment to reassure neighbors who had been disturbed by the fracas. Three agents were clustered about Mr. Gonzalez, "conversing” with him. At least one agent was guarding Mrs. Gonzalez in the bedroom. None of the agents had their weapons drawn while they were in the apartment.
Without described preliminary conversation, Agent Horn read Mr. Gonzalez the now standard preinterrogation warn *126 ings (Miranda v Arizona, 384 US 436). On question, Gonzalez responded that he understood them. Agent Horn and two other agents then went into the guarded bedroom and read Mrs. Gonzalez the same warnings, and she too said that she understood them.
About five minutes after the agents had entered the apartment, Mrs. Gonzalez’ mother and grandfather came in. Mrs. Gonzalez’ mother immediately went into the bedroom to talk with her daughter. Mrs. Gonzalez’ grandfather berated her for having married Joseph. After being in the apartment for approximately five minutes, they were "required to leave” by the agents. Agent Jenkins explained that Mrs. Gonzalez’ mother "could say what she had to say and it was time to leave”. These events consumed a period of approximately one-half hour.
The bare description of what had occurred thus far is the version of the Federal agents. As might be expected, a quite different narration was given by the defense witnesses, who described threats to expose the defendants to State prosecution under the severe State sentencing laws, threats to separate the newlyweds forever, and the desirability of defendants signing consents to a full-blown search of the apartment induced further by the comment about how a search warrant was "on the way”. Interestingly, when asked whether he had threatened Mr. Gonzalez with State prosecution with its well-advertized severe penalties, rather than Federal prosecution, Agent Horn replied with negative pregnant in classic form "Not in the apartment”. True, after the arrest, Mr. Gonzalez averred that he had been so threatened in seeking his cooperation with the Federal agents. This is now explained to have occurred in a different "context” and at a different time.
Agent Horn then returned to the living room and asked Mr. Gonzalez whether he now wished to "waive his rights”. Gonzalez said that he did. The Federal agent then asked him whether he was willing to sign a statement consenting to a search. Agent Horn read a printed consent form to Gonzalez and had him read it. Having agreed to sign the consent form, Gonzalez was unbound and signed the form. At the suppression hearing, Mr. Gonzalez testified that, when he signed the consent, he did not know whether his wife had disposed of all the drugs before she let the agents enter the apartment.
Returning now to the bedroom, Agent Horn told Mrs. Gonzalez that her husband had signed a consent form and *127 asked her if she would. After seeing her husband’s signature to the consent form, she said that she would sign it too. The Federal agent read a consent form to her and then handed it to her to read and sign.
At the suppression hearing, Mrs. Gonzalez was asked whether "there were other drugs in the apartment other than the ones that you had flushed down the toilet bowl?” She responded "No”. She was then asked whether she thought she had gotten rid of everything. She responded "Pretty much”. She was asked "So, when you signed the consent you figured you had gotten rid of everything?” She responded "No”. She testified that she knew some cocaine had been found in the bathroom before she had signed the consent. When finally asked "Did you know there were any others [drugs] in the apartment?” She responded "I wasn’t sure.”
After the Gonzalezes were taken away, a full-blown search discovered a commercial quantity of drugs. The significance of a rummage search after the Gonzalezes had been removed indicated again the critical need for the consent, if there were no warrant.
Governmental intrusion into the privacy of the home is, with limited exceptions, prohibited by constitutional limitations in the absence of a valid search warrant (NY Const, art I, § 12; US Const, Arndts IV, XIV; see People v Loria, 10 NY2d 368, 373; Silverman v United States, 365 US 505, 511; Jones v United States, 357 US 493, 498; cf. People v Gleeson, 36 NY2d 462, 466). Even if an individual has been lawfully arrested, the police are not thereby free to conduct a full-blown, rummaging search of the arrested person’s home without a warrant (see People v Clements and Metzger, 37 NY2d 675, 678-679, cert den 425 US 911; People v Perel, 34 NY2d 462, 468; Chimel v California, 395 US 752, 764-765).
One of the limited exceptions to the warrant requirement and, indeed, to the requirement of probable cause, is voluntary consent to the search (People v Singleteary, 35 NY2d 528, 532; People v Carter, 30 NY2d 279, 282; People v Pelow, 24 NY2d 161, 165; People v Loria, 10 NY2d 368, 373, supra; Schneckloth v Bustamonte, 412 US 218, 219, 222; cf. People v Lane, 10 NY2d 347, 353). In the instant case, the People concede that the legality of the search of the Gonzalez apartment turns entirely upon the validity of either of the Gonzalez’ consents. (Indeed, the agents by obtaining and relying on the signed consents indicated unequivocally that they recog *128 nized the doubtfulness of a right to a rummage search without a warrant [cf. People v Clements, 37 NY2d 675, 678-679, supra].) Of course, the People also recognize that theirs is the heavy burden of proving the voluntariness of the purported consents (see People v Kuhn, 33 NY2d 203, 208; People v Whitehurst, 25 NY2d 389, 391; Bumper v North Carolina, 391 US 543, 548-549; People v Jackson, 46 AD2d 816, 817, affd 39 NY2d 64; People v Talbot, 44 AD2d 641; People v Stepps, 31 AD2d 59, 62).
Consent to search is voluntary when it is a true act of the will, an unequivocal product of an essentially free and unconstrained choice. Voluntariness is incompatible with official coercion, actual or implicit, overt or subtle (see People v Kuhn, 33 NY2d 203, 208, supra; Schneckloth v Bustamonte, 412 US 218, 225-228, supra). As the Supreme Court stated in Bumper v North Carolina (391 US 543, 550, supra), "Where there is coercion there cannot be consent”.
No one circumstance is determinative of the voluntariness of consent. Whether consent has been voluntarily given or is only a yielding to overbearing official pressure must be determined from the circumstances (see People v Kuhn, 33 NY2d 203, 208-209, supra; Schneckloth v Bustamonte, 412 US 218, 224, supra; see, generally, Search—Consent While in Custody, Ann., 9 ALR3d 858, 864-866).
An important, although not dispositive, factor in determining the voluntariness of an apparent consent is whether the consenter is in custody or under arrest, and the circumstances surrounding the custody or arrest. True, custody or arrest alone does not necessarily preclude voluntariness (see People v Rodriquez, 11 NY2d 279, 287; People v Mule, 46 AD2d 414, 421; United States v Watson, 423 US 411, 424-425; United States v Ellis, 461 F2d 962, 968, cert den 409 US 866). Custody, or, more compellingly, the immediate events of an arrest, especially a resisted arrest, do, however, engender an atmosphere of authority ordinarily contradictory of a capacity to exercise a free and unconstrained will (see People v Rodriquez, 47 Misc 2d 551, 557; People v Porter, 37 Misc 2d 73, 76 [J. Irwin Shapiro, J.] Castaneda v Superior Ct., 59 Cal 2d 439, 443 [Traynor, J.]; United States v Lewis, 274 F Supp 184, 188 [Mansfield, J.]; Search—Consent While in Custody, Ann., 9 ALR3d 858, 875-876).
This is especially true when the individual in custody or under arrest is confronted by a large number of police agents *129 (see People v Cameron, 73 Misc 2d 790, 798; People v Porter, 37 Misc 2d 73, 76, supra; United States v Lewis, 274 F Supp 184, 188, supra). Moreover, the fact that a defendant was handcuffed has been considered a significant factor in determining whether his apparent consent was but a capitulation to authority (see Castaneda v Superior Ct., 59 Cal 2d 439, 443, supra; People v Currier, 232 Cal App 2d 103, 110; United States v Lewis, 274 F Supp 184, 188, supra; cf. People v Zazzetta, 27 Ill 2d 302, 310-311; but see, e.g., Carpenter v United States, 463 F2d 397, 401, cert den 409 US 985). Submission to authority is not consent (People v Gorsline, 47 AD2d 273, 276; Bumper v North Carolina, 391 US 543, 548-549, supra; Johnson v United States, 333 US 10, 13).
In the instant case, the Gonzalezes were arrested, separated from each other and their arms were handcuffed behind their backs. As many as nine armed Federal agents had swarmed about the small apartment and, about one-half hour after their entry, each defendant was asked to sign the consent to search in the immediate presence of at least three agents. Mrs. Gonzalez’ mother and grandfather had been excluded from the premises. Thus, the atmosphere, as inferred from the testimony of the agents and interpreted on the objective facts, in which the "consents” were obtained could hardly have been more coercive, short of direct police testimony of actual duress.
Another factor to be considered in determining the voluntariness of an apparent consent is the background of the consenter (see United States v Watson, 423 US 411, 424-425, supra; Search—Consent While in Custody, Ann., 9 ALR3d 858, 880, 885-886). A consent to search by a case-hardened sophisticate in crime, calloused in dealing with police, is more likely to be the product of calculation than awe. Here, the Gonzalezes were both under 20 years of age and were newlyweds of three days. They had had very limited prior contact with the police. Under these circumstances, the ineluctable inference, except to the jaded, is that the consents could not be, on any creditable view of the agents’ testimony, the product of a free and unconstrained choice.
Another factor to be considered is whether the consenter has been, previously to the giving of the consents, or for that matter even later, evasive or un-co-operative with the law enforcement authorities (see Castaneda v Superior Ct., 59 Cal 2d 439, 443, supra; People v Currier, 232 Cal App 2d 103, 110, *130 supra; cf. People v Alberta, 37 Misc 2d 847, 848). Of course, if defendants had assisted the Federal agents in their search, this would be evidence of a voluntary consent. But, to the contrary, Mr. Gonzalez had previously forcibly resisted arrest by the Federal agents, one of whom had his weapon drawn. Mrs. Gonzalez, too, did not open the apartment door immediately upon request, she delayed approximately six minutes. She then opened the door only when the banging and kicking at the door indicated that the agents would enter in any event. If Mrs. Gonzalez had been trying to dispose of contraband, it was now obvious, she was not to be left free to complete the task. Such determined resistance and evasion is hardly compatible with a suddenly voluntary consent, which consent in all likelihood would be recognized as self-destructive. Instead, the circumstances are evidence that the consents were a yielding of overbearing official pressure.
A final factor is whether a defendant was advised of his right to refuse to consent (People v Mule, 46 AD2d 414, 421, supra; People v Talbot, 44 AD2d 641, supra; Schneckloth v Bustamonte, 412 US 218, 249, supra). Such advice is not mandatory (People v Kuhn, 33 NY2d 203, 209, supra). Failure to advise, however, may be considered in determining whether a consent was voluntary. In the instant case, the Gonzalezes were informed of their right to refuse to consent to the search. It must be noted that such advice was contained in a printed form read to and signed by them, hardly an amelioration of the coercive atmosphere in the apartment (cf. People v Rodriquez, 47 Misc 2d 551, 557, supra).
In taking the composite of the facts: the number of agents present in the small apartment; the youth of the Gonzalezes; the separation and handcuffing of these newlyweds; the removal of parent and grandparent from the scene; the circumstances of the arrests; and the sudden acquiescence of the segregated couple, handcuffed, and without further ado, in the signing of the printed consents, negates totally the idea of a free act of will, or else the pious language of the cases is only a gloss on an unacknowledged ugly reality. Under these circumstances, as a matter of law, the apparent consent was induced by overbearing official conduct and was not a free exercise of the will.
What has been said thus far is enough, or should be enough. But there are two aspects of the narrated events, always giving the police version alone, which for some purposes merit *131 elaboration, if only to see that the facts in cases involving constitutional limitations are not clinically dissected with the body fluids drained and the network of nerves dead.
The removal of the mother and the grandfather, hardly done in the almost Chesterfieldian manner described by the police, but even so, relieved these two young people of the only persons at hand, perhaps at that point better than a lawyer, to advise them and offer moral and material support in making a choice which would affect their liberty and undoubtedly the course of their lives. Of course, these persons of the blood need not have been permitted to remain, but surely their removal first before the consents were obtained, makes the almost wordless obtaining of the consents a mockery.
The second aspect is the swarming of armed Federal agents in the small apartment, hardly a backdrop for a voluntary act, again with an almost wordless preamble, in signing a printed consent to a necessarily fateful full-blown search. The worst of it is that all this was unnecessary once defendants had been arrested and the agents and the defendants remained long enough in the premises for a search warrant to be obtained, a warrant that must have been granted, and with a time interval involved which made impossible the removal of any hidden contraband pending the obtaining of the warrant. None of the permitted exceptions to a warrantless search were present (People v Singleteary, 35 NY2d 528, 531-532, supra). This was offensive official conduct more suitable to a police society than to a policed society.
The instant seizure would have hardly survived scrutiny if the matter had been prosecuted in the Federal courts as the agents at some point had intimated they would do. It may not survive scrutiny in the State courts. A bad seizure under the Federal Constitution in the Federal courts is also a bad seizure under both the Federal and State Constitutions in the courts of this State.
The related conviction of Mr. Gonzalez for the initial criminal sale of cocaine in the third degree, affirmed by the Appellate Division, has not been appealed to this court.
Accordingly, the orders of. the Appellate Division should be affirmed.