*49 OPINION OF THE COURT
David Levy, J.
This is a motion by the District Attorney to reargue a motion by defendant, Sal Cypriano, to suppress certain steno-graphically recorded and unrecorded oral statements. After a hearing, the court initially held that the statements should be suppressed. The motion for reargument is granted, and upon such reargument the court renders the following opinion.
At approximately 5:00 a.m. on the morning of July 18, 1976, while on radio patrol, Detective Sheehan and his partner received a call of a fire bombing at 3545 Edson Avenue, Bronx, New York. They proceeded immediately to the scene and found a one- or two-story building. The outside brick had been scorched by fire. When they entered the house they found scorched curtains, broken glass and broken windows. They were told by a Mrs. Johnson that gasoline bottles had been thrown at the building, setting it afire.
Arriving at the house, Detective Sheehan also spoke to a group of four or five people. One of the group told him that four or five white, male youths had thrown the bottles at the building causing the fire. One of the group told him that he obtained the license number of the car the youths had come in and another person gave him a description of the car, i.e., a 1968 or 1969 Buick Le Sabre with two doors, tan or brown with a vinyl top. Detective Sheehan did not know any of the informants and did not attempt to ascertain their names or their reliability, nor did he learn anything more about them.
Sheehan and his partner returned to the precinct and checked the license number through the police computer. He obtained the name of Salvatore Cypriano and his address on Gunther Avenue, Bronx, New York, as well as a description of the vehicle that the computer had registered under that license number.
About 7:00 a.m. Sheehan proceeded to Gunther Avenue and, double-parked close to the private house where Cypriano lived, was a brown Buick with the license number he had obtained. (The description of the car from the computer did not match the car he saw, but the car he saw did match the description he had received earlier at the scene.) He then returned to the precinct at about 8:00 a.m. Before going off duty he relayed the information about the fire bombing, the license number, the name and address of Cypriano and what he had learned that morning, to Detective O’Connor. He also told Detective O’Connor that he had arrested Cypriano about a month *50 earlier on a previous matter and that he knew what Cypriano looked like. He also mentioned that he had seen Cypriano many times in the neighborhood. Cypriano and his friends frequented the area he patrolled, for a long time.
Sometime before noon, Detective O’Connor checked with the computer to see if any warrants were outstanding against Sal Cypriano. He received a printout of a warrant, indicating that the Bronx Criminal Court had a bench warrant outstanding for his arrest on a failure to appear on a gun possession charge.
About 12:30 p.m., or so, about five and a half hours after Detective Sheehan had been to Cypriano’s house to observe the car in question, O’Connor, with Detectives McGinness and De Paolis proceeded to Cypriano’s house with the printout. At the house they found the car and arrested Cypriano on the warrant. Concededly, they fully intended to question him at the precinct concerning the alleged arson and his participation in it. O’Connor indicated that he had no intention of actually bringing Cypriano to court on the warrant. In fact, not only did he not bring him to court immediately, but he also detained him at the 47th Precinct until 5:00 a.m. the following day (about 17 hours). Cypriano was given the required Miranda warnings, both at his house, and at the precinct.
The questioning of Cypriano at the precinct began at approximately 2:00 or 3:00 p.m. and continued intermittently until approximately 11:00 or 12:00 at night. During this period of time, for at least two hours, he was probably not questioned. He was certainly questioned about the alleged arson during most of the period. He was fed. He was not in a cell or handcuffed, but kept in a squadroom. He was not threatened or questioned for prolonged periods, he was not questioned in relays, and the questioning was not otherwise overbearing.
The police received certain information from him, in the beginning, which turned out to be false, but some time, by 11 o’clock or so, Cypriano stated that he had been at the scene and then named other defendants who were also at the scene, or at least he gave the nicknames of some and actual names of others.
Sometime after midnight Cypriano made a statement which was recorded by a stenographer upon questioning by an Assistant District Attorney. The substance of the recorded *51 statement was the same as that made to the police officers earlier.
The People contend that the arrest of Cypriano on the bench warrant was legal (although they concede that the motive behind the arrest was to question him about the alleged arson), and since defendant had been given the appropriate Miranda warnings, the custodial interrogation of him concerning the arson was proper. Therefore, the People argue that the statements obtained from him as a result of the arrest should not be suppressed.
Clearly, a bench warrant gave the police probable cause for an arrest on that warrant. The motive behind the arrest did not make the arrest illegal, even if the motive was improper. (United States v Seay, 432 F2d 395, cert den sub nom. McGee v United States, 401 US 942; United States v McCambridge, 551 F2d 865.) Nevertheless, the motive is important in determining the reasonableness of a search incident to a lawful arrest, or as in this case, of custodial questioning about an entirely different crime for 9 to 11 hours. (Abel v United States, 362 US 217; Amador-Gonzalez v United States, 391 F2d 308.)
In Abel v United States (supra, pp 225-226) the court stated the claim of the petitioner:
"The underlying basis of petitioner’s attack upon the admissibility of the challenged items of evidence concerns the motive of the Government in its use of the administrative arrest. We are asked to find that the Government resorted to a subterfuge * * *
"Were this claim justified by the record, it would indeed reveal a serious misconduct by law-enforcing officers. The deliberate use * * * of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts.”
Although in the Abel case (supra), the crucial facts were found against the petitioner, the Supreme Court clearly underlined its concern with the use of pretext or subterfuge arrests by law enforcement officers to circumvent the Fourth Amendment. (See United States v Lefkowitz, 285 US 452.) Other Federal courts have declared evidence obtained as a result of a search incident to a sham or pretext arrest, inadmissible. (Taglavore v United States, 291 F2d 262; United States v Edmons, 432 F2d 577.)
The New York Court of Appeals has also evinced a similar *52 concern with pretext or sham arrests. (People v Robinson, 13 NY2d 296; People v Davis, 13 NY2d 690 and People v Jackson, 22 NY2d 446.) In these cases, there was a valid arrest for vagrancy, in order to question an accused in custody about another crime. The court clearly stated that these were sham or pretext arrests and suppressed the statements made by the defendants as "fruits of the poisonous tree.”
In People v Jackson (supra) the court emphasized just what the real vice is when the arrest is a sham. There, the People had relied on a statement by Jackson that he was an unemployed gambler, living on the proceeds of prostitution. The court wrote (p 452): "Whether or not this would support a vagrancy charge is beside the point. Since the police employed the arraignment as a device to detain and question Jackson about the murder, his answers must be excluded even though he may, in fact, have been a vagrant.” Obviously, if the court felt that lack of probable cause rendered the arrest illegal it could have easily stated that the arrest was without probable cause and then avoided the use of the word "sham” (or in People v Davis, supra, "pretext”) arrest. Something more than the validity of the arrest is the issue.
The Fourth Amendment prohibits unreasonable searches and seizures and provides that warrants may be issued upon probable cause. The courts have construed this to mean that a reasonable seizure (arrest) without a warrant is one where the police officer has probable cause to believe that a crime has been committed and that the person to be arrested has committed the crime. This has not been extended to arrests within a person’s home, unless there are exigent circumstances. (United States v Santana, 427 US 38; United States v Reed, 572 F2d 412.)
Similarly, reasonable searches without a warrant have been limited to searches incident to a lawful arrest (Chimel v California, 395 US 752) and to searches in a person’s home, provided there are exigent circumstances to excuse the failure to obtain a warrant.
 However, searches and seizures outside of these limited areas are in violation of the Fourth Amendment, and property seized in such a manner has been suppressed. (Mapp v Ohio, 367 US 643; People v Gonzalez, 39 NY2d 122; cf. People v Perel, 34 NY2d 462.) Statements obtained as a result of a violation of the Fourth Amendment by law enforcement *53 officers have similarly been suppressed. (Wong Sun v United States, 371 US 471.)
Clearly, the thrust of the law has been to place an impartial judicial officer between well-meaning law enforcement officers engaged in their duties and a private citizen living in his own house, in order to protect against unreasonable invasions of a citizen’s privacy, absent exigent circumstances. The law has attempted to provide a cool and detached view of the necessity for such an invasion of the privacy of any citizen by providing for the use of a warrant in most cases. Probable cause that a crime was committed and that defendant committed the crime must be demonstrated for an arrest warrant or probable cause that specific property is located in the premises and that it has some connection to the alleged crime must be shown for a search warrant.
Because a sham or pretext arrest attempts to circumvent these requirements by claiming that the search was incident to a lawful arrest, or that the questioning of an accused in custody was incident to a lawful arrest, the evidence so obtained has been suppressed. (People v Robinson, 13 NY2d 296, supra; People v Davis, 13 NY2d 690, supra; People v Jackson, 22 NY2d 446, supra.) Otherwise, if law enforcement officials, without probable cause or exigent circumstances, could find any pretext for an arrest, the protection provided by the Fourth Amendment would be rendered meaningless.
Clearly, this is the real concern of the line of cases suppressing evidence seized and statements obtained as a result of a pretext or sham arrest.
Turning to the facts in this case, it is clear that the police officers did not have probable cause to arrest Cypriano. He was in his home and there were no exigent circumstances. They were lacking sufficient information to obtain a warrant for his arrest. Under the circumstances Detective O’Connor obtained a printout of a bench warrant in order to gain access to Cypriano’s house, to arrest him and then to take him into custody in order to question him about the alleged arson for a period of 9 to 11 hours. Obviously, no questioning was necessary as to the bench warrant. His testimony and that of his fellow police officers indicates that they had no intention of bringing him immediately to court on the warrant. They frankly stated, as the investigating officers in the arson case, that they wanted to question him about the arson. Executing bench warrants was not their function and, in fact, defendant *54 was not brought to court until the following day, although arrested about 12 noon, despite the fact that the statute, CPL 530.70 (subd 2), clearly requires that a person arrested pursuant to a bench warrant be brought immediately to court.
There was never any intention to bring him to court in accordance with the statute but to question him, in custody, for as long as necessary, to obtain the information needed to make a valid arrest on the arson charge.
This was purely and simply a ruse, a subterfuge, a pretext, or a sham to bring defendant to the police precinct for questioning. His statements, after 9 to 11 hours of questioning were clearly the fruits of the poisonous tree. The requirements of the Fourth Amendment were circumvented since no Judge ever ruled on the question of probable cause as to the arson. Such misuse of court process cannot be countenanced as proper police action.
Accordingly, the court adheres to its original decision granting the motion to suppress.