■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALLAN LOUIS LITT, Appellant.—Appeal by defendant from a judgment of the County Court, Suffolk County, rendered January 24, 1979, convicting him of criminal possession of a controlled substance in the third degree, upon a plea of guilty, and imposing sentence. The appeal brings up for review the denial, after a hearing, of defendant's motion to suppress physical evidence. Judgment reversed, on the law, motion granted, indictment dismissed, and case remitted to the County Court, Suffolk County, for the purpose of entering an order in its discretion pursuant to CPL 160.50. The question raised on appeal is whether the defendant's consent to a search of his house, while he was under arrest and in custody, was voluntarily and intelligently given, or was the product of a yielding to the coercive power of superior police forces. We hold that upon this record, the defendant's consent was vitiated and the motion to suppress should have been granted. The facts essentially are not disputed. The defendant was indicted for several counts of criminal possession of a controlled substance in varying degrees. On March 14, 1977, at approximately 9:00 P.M., Officer Giglio of the Nassau County Police Department's Narcotics Squad, acting undercover, entered the automobile of a suspected drug dealer, one Paul Hefner. Following some negotiations, Hefner and Officer Giglio proceeded to 16 Woodland Place, Huntington, New York, in Suffolk County, where Hefner agreed to obtain some narcotics for Giglio. Other Nassau County narcotics agents followed. Upon arriving at the address, which is the residence of defendant Litt, Hefner entered the residence by himself. Hefner eventually returned from the house and turned over to undercover agent Giglio a clear plastic bag containing white powder. At this time, Hefner was arrested and informed of his constitutional rights. Hefner then informed the police that he had just met with Allan Litt, the defendant, inside the residence, and that the latter had given him a small package of cocaine from a small room at the top of the stairs. This was the package that he gave to Giglio. According to Hefner, defendant Litt retained Hefner's car keys as "collateral" to insure his return with the purchase price. During this time, the police observed a figure with short hair staring out of the top window of the Litt residence. Upon the arrival of a superior officer, Sergeant Fitterer, he, Detective Holmes and Officer Elmwood knocked on the front door of the Litt residence to retrieve Hefner's keys and to secure the premises. A man other than the defendant answered the door and Litt was summoned. He thereupon spoke to the three policemen with the front door ajar only several inches. Upon inquiry by the defendant as to who was at the door, the police officers displayed identification badges and indicated that they were looking for Hefner's keys. Litt denied having the keys. At this point, the officers forcibly entered the house without permission. Litt was asked if there were any other people present inside the house.

He responded that there were two persons in the upstairs bedroom. Detective Holmes immediately went upstairs to verify this and ascertained that the defendant's wife and baby were in the bedroom. The defendant and his wife were then advised of their constitutional rights and informed that a search warrant was being obtained for the contraband believed to be in the house. It appears from the record that the defendant was denied an opportunity to call his attorney. Thereafter, Litt inquired if there were any alternatives to a search warrant, and what the consequences of the search would be. The police advised Litt that a warrant would permit a search of the residence and that "anyone or all of the individuals of that residence could be in fact arrested" if contraband was seized. Further, the police informed Litt that, in lieu of a search warrant, he could *consent* to a search. It is undisputed that Mrs. Litt asked the police what would happen to her two-month-old baby, whom she was breastfeeding, if she were arrested. According to the testimony of Detective Holmes, Mrs. Litt was advised that, "If you can contact [your] family, the baby would go to the family. If not, it would be taken over by the county until you are bailed or arraigned or whatever." This account was vigorously disputed by Mrs. Litt and two other persons in the house at the time of the incident. They testified essentially that the police "threatened" Litt and his wife by saying that they were going to take their baby away if the Litts failed to consent to a search of the house. Indeed, according to defense witness Switkes, one "angry" police officer was overheard "in a very loud voice" to ask "where the nearest child shelter was". Moreover, according to Mrs. Litt, the police refused to let her "alone in any room to feed the baby until they got what they came in to tear the house apart for". In any event, Litt discussed the matter of consenting to the search with his wife privately for approximately 20 minutes, whereupon the defendant was heard to say, "They're going to find it anyway." At this time, Litt agreed to consent to a warrantless search and he turned over several plastic bags of white powder and several vials of a brownish green substance which had been secreted in different locations around the house. At the time of his consent, there was a total of seven police officers in the house. Approximately 10 minutes after the drugs were surrendered, the defendant executed a consent form, written by Sergeant Fitterer but couched in Mr. Litt's own language. Mrs. Litt was never arrested or indicted for possession of drugs. It was later stipulated that the defendant had no prior criminal record. The defendant thereafter moved to suppress the physical evidence on the ground that his consent to the warrantless search was coerced and involuntary. The County Court denied the motion holding that (1) the police had probable cause to arrest Litt in his residence without a warrant based on the detailed information of the informant, Hefner, as corroborated by the drugs actually supplied at the scene (citing, *inter alia, People v Payton,* 45 NY2d 300, 305), and pursuant to Litt's consent, which was not coerced under the totality of the circumstances (citing *People v Gonzalez,* 39 NY2d 122, and *Schneckloth v Bustamonte,* 412 US 218). Thereafter, the defendant entered a plea of guilty to one count of criminal possession of a controlled substance in the third degree in full satisfaction of the indictment. We reverse the judgment, grant the motion to suppress and dismiss the indictment. We have no trouble in agreeing with the County Court insofar as upholding Litt's warrantless *arrest* in his house. Undoubtedly, the police possessed probable cause to believe defendant was then committing the crime of illegal possession of drugs based upon the detailed information supplied by Hefner and corroborated by actual contraband (see, e.g., *People v Morales,* 42 NY2d 129, 136;

*Draper v United States,* 358 US 307, 313). Hence, even absent the exigent circumstances which conceivably existed by virtue of the transient nature of the contraband, the police were authorized to arrest Litt without a warrant (see *People v Payton,* 45 NY2d 300, 305, 310, *supra; cf. People v Hodge,* 44 NY2d 553, 557-558; *Mincey v Arizona,* 437 US 385, 392). However, we disagree with the County Court as to the propriety of the warrantless search of Litt's residence. The People concede that the search cannot be justified as incidental to a lawful arrest (see, e.g., *Chimel v California,* 395 US 752, 766). In *People v Gonzalez* (39 NY2d 122, 128, *supra),* the Court of Appeals observed that when a defendant is in custody, the People have a "heavy burden of proving the voluntariness of the purported consents" and that the "immediate events of an arrest, especially a resisted arrest * * * engender an atmosphere of authority ordinarily contradictory of a capacity to exercise a free and unconstrained will" (citing, *inter alia, People v Porter,* 37 Misc 2d 73, 76). The court went on to analyze the various factors involved in determining whether the purported consent was viable. Applying these factors to the instant case, it becomes readily apparent that Litt's will to consent was overborne by coercive police forces based upon the totality of circumstances: (1) there were seven police officers in the house at the time that the defendant consented; this is close to the "swarming of armed Federal agents in the small apartment" decried in the *Gonzalez* case *(supra,* p 131); (2) the People concede that Litt had no prior criminal record; hence, Litt evidently was not a "case-hardened sophisticate in crime, calloused in dealing with police" *(People v Gonzalez, supra,* p 129); and (3) perhaps most important, Litt was faced with intense and unjustified psychological pressure to consent to the search at the risk of possibly losing his two-month-old baby to a child welfare shelter. While it is true that Litt did not physically resist arrest, and did actually co-operate in the search itself, these are but additional factors in the equation, not determinative of the outcome per se. On balance, the qualitative and quantitative elements of coercion predominate, and lead to the conclusion that "the apparent consent was induced by overbearing official conduct and was not a free exercise of the will" (see *People v Gonzalez, supra,* p 130). Accordingly, the motion to suppress should have been granted. Lazer, J. P., Margett, Martuscello and Mangano, JJ., concur.