OPINION OF THE COURT
Faviola Soto, J.
Defendant is charged with violating Penal Law § 265.01 (4), criminal possession of a weapon in the fourth degree. Defendant moved for suppression at trial of tangible evidence and statements. A Mapp/Huntley/Dunaway hearing was conducted on September 21, 1994.
FINDINGS OF FACT
The only witness at the suppression hearing was Investigator Taylor of the New York State Department of Correctional Services. The court finds his testimony on the whole to be incredible and unreliable. Investigator Taylor was at all pertinent times an investigator in the absconder and escape unit of the New York State Department of Correctional Services, a position which carries peace officer status. Part of Officer Taylor’s duties was to apprehend fugitives who have either escaped from prison or have failed to return to prison from a work release program. Officer Taylor received a document *32 entitled "Authorization for Detention and Return” dated January 25, 1994 for a person named Michael Wright. This document, sometimes referred to as an "Absconder Warrant,” is issued by the Superintendent of the New York State Department of Correctional Services pursuant to section 856 (4) of the Correction Law. The "Authorization” listed only the name and NYSID number of Michael Wright and the name and address of the correction facility from which Mr. Wright allegedly fled.
Armed with this document, Officer Taylor set out to apprehend Mr. Wright. Officer Taylor was informed that Mr. Wright was "staying with” Ricardo Jimenez, defendant herein. The alleged source of this information was the mother of a Mr. Lopez who is "a friend” of Mr. Wright and Mr. Jimenez. Officer Taylor was told the street address of the house in question, and that there was a "red blazer” parked outside.
Officer Taylor went to the location on February 12, 1994 and waited outside for approximately 2Vz to 3 hours. He did not see Michael Wright enter or exit the house. Officer Taylor left the location, "went back and ran the plate” on the red blazer, and learned that the vehicle belonged not to Mr. Wright but to Mr. Jimenez. Officer Taylor did not attempt to learn the identity of the owner of the house.
Neither Officer Taylor nor his supervisor attempted to obtain a search warrant, even though, in Officer Taylor’s estimation, there was sufficient time to do so.
The next day Officer Taylor returned to the location with five other "investigators,” arriving there at some time between 5:30 a.m. and 6:00 a.m. The officers’ stated intention in going at that hour was to catch the person asleep and unprepared. The officers all wore bullet proof vests and blue police jackets. All displayed their badges. The six officers surrounded the house. One of the officers knocked on the door two times, the second being of sufficient force to activate the home burglar alarm. When defendant approached the door, Officer Taylor stated "Police — we need to come in and see if Mr. Wright is here.” When defendant did not immediately respond, Officer Taylor stated "I’m Investigator Taylor from the Department of Corrections — we need to come in.” Defendant opened the door but refused to let them in. Defendant stated "my wife is not decent.” Officer Taylor replied, "Could you get her decent because we need to look around, if it’s all right *33 with you.” Officer Taylor then stated, "I have a warrant for Michael Wright,” and showed him the warrant with a photograph. Defendant denied knowing Michael Wright. Officer Taylor then stated, "Do you mind if we look around?” According to Officer Taylor, defendant stated, "I don’t mind.” Once the officers were inside the home, defendant cautioned them that his two children were sleeping upstairs and that there was another couple with two children sleeping downstairs.
The officers proceeded to look around the house. Several officers went upstairs. Officer Taylor went downstairs and encountered a man and a woman who looked like they had been sleeping. Officer Taylor did not learn their names. He asked the man if he knew Mr. Wright. The man did not. Officer Taylor asked him to open a closet door, and the man complied. Officer Taylor then saw what he described as a "soft gun case.” He asked the other man to take it out and put it on the bed. When the man did so, Officer Taylor noticed that it was a loaded rifle.
Officer Taylor then took the rifle upstairs, showed it to defendant and said "Tell me this is Mike’s.” Defendant then said "Mike was here for three days, but I don’t know where his is now.” Defendant also stated that "A friend of mine told me I could buy (the gun) in Westchester. It was a sergeant or a detective.”
DISCUSSION
At the outset, this court finds that the so-called "Absconder Warrant” provides no basis for the activities engaged in by Officer Taylor and his fellow officers. Law enforcement agents are prohibited from entering a person’s home without a warrant, absent exigent circumstances or consent. (Payton v New York, 445 US 573 [1980].) Further, if officers have an arrest warrant for a suspect, they may not enter the home of a third party to search for that suspect without a search warrant, absent exigent circumstances or consent. (Steagald v United States, 451 US 204 [1981].)
It is clear that the "Authorization for Detention and Return” is not a search warrant for purposes of Fourth Amendment analysis. A search warrant, by definition, is a court order. (CPL 690.05 [2].) By contrast, an "Authorization” issued pursuant to Correction Law § 856 (4) is issued by an official of the New York State Department of Correctional Services. It authorizes peace officers to take into custody a *34 person who is already in the legal custody of the Department of Correctional Services. It is not of a juridic nature. It does not have the benefit of judicial review, and, as such, cannot empower an officer to enter a third person’s home. Thus, the officers’ activities constituted a warrantless entry into defendant’s home.
A warrantless entry into a person’s home may, however, be properly undertaken by law enforcement agents if they have obtained the consent of a person authorized to give consent. (People v Nalbandian, 188 AD2d 328 [1st Dept 1992], Iv denied 81 NY2d 890 [1993].) Consent must be voluntarily given and must not be the product of overt or even subtle coercion. (People v Flores, 181 AD2d 570 [1st Dept 1992].) The People must meet a heavy burden to establish that consent was voluntarily given. (People v Gonzalez, 39 NY2d 122 [1976].)
Here, the People have failed to establish that defendant gave his voluntary consent to this search. This court finds that any statements made by defendant evincing consent were not a voluntary act of defendant’s will. Rather, these remarks were the product of a situation orchestrated by the officers to intimidate defendant, subvert his will, and engender acquiescence. These officers had ample time to seek judicial approval of a search warrant, but failed to do so. Indeed, it is problematic whether, on these facts, such approval would be forthcoming.
The court finds that defendant’s initial refusal to consent to the search was overborne by the officers’ display of authority. The police went to the home of this defendant at an early hour with the expressed purpose of finding the occupants asleep and off their guard. Officer Taylor testified on direct examination that he rang a door bell, and with regard to the cause of the alarm answered "who knows.” On cross-examinatian, however, he testified that the alarm went off after the officers knocked on the door a second time. The court finds that the alarm was, in fact, triggered by the degree of force the officers employed when they knocked on the door. The officers, all wearing bullet proof vests and displaying their shields, had defendant’s home "surrounded.” Under those circumstances, the court finds Officer Taylor’s testimony that defendant voluntarily consented to the search to be incredible, and deliberately fashioned to withstand constitutional challenge. (See, e.g., People v Void, 170 AD2d 239 [1st Dept 1991].)
Further, even if the consent had been properly obtained, *35 the search exceeded the scope of that consent. Defendant’s permitting the officers to cross the threshold and "look around” is not tantamount to consent to a basement to attic search of the house. An invitation to enter the home "cannot reasonably be construed as a broad consent for the police to wander at will throughout the entire dwelling.” (People v Flores, supra, at 571.) Defendant communicated his discomfort with such a search by cautioning Officer Taylor about the children asleep upstairs and the other family members sleeping downstairs. The fact that Officer Taylor asked the man downstairs to open the closet door reflects the officer’s awareness that he did not have defendant’s consent to search the closet. The People failed to establish that this other unnamed person had authority to himself give consent to a search of the closet.
A totality of the circumstances demonstrates that the officers did not have valid consent to either enter the home without a warrant or to conduct a search of the closet from which the rifle was seized. The motion to suppress the rifle is granted.
The motion to suppress defendant’s statements is likewise granted. The statements were a direct product of the officers’ unlawful entry into the home and therefore must be suppressed. (See, People v Harris, 77 NY2d 434 [1991].)