96 N.Y.2d 521 (2001)
755 N.E.2d 329
730 N.Y.S.2d 265
THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v.
RAWLE McINTOSH, Appellant.
Court of Appeals of the State of New York.
Argued April 25, 2001.
Decided June 28, 2001.
*522 Eugene P. Devine, Public Defender of Albany County, Albany (Shannon K. Geraty of counsel), for appellant.
*523 Paul A. Clyne, District Attorney of Albany County, Albany (Kimberly A. Mariani of counsel), for respondent.
Chief Judge KAYE and Judges LEVINE, CIPARICK, WESLEY and ROSENBLATT concur with Judge GRAFFEO; Judge SMITH concurs in result in a separate opinion.

OPINION OF THE COURT
GRAFFEO, J.
This appeal requires us to consider the admissibility of evidence seized as the result of an encounter between defendant and the police on a commercial passenger bus during a stopover in Albany, New York. Based on the particular facts and *524 circumstances of this case, we reverse the order of the Appellate Division which upheld defendant's conviction.
According to findings of fact made by County Court, and undisturbed by the Appellate Division, at approximately 3:30 A.M. on January 23, 1997, an investigator from the Albany County Sheriff's Department boarded a bus which had arrived from New York City. The investigator, wearing civilian clothing with his police badge prominently displayed on his coat, was accompanied by two other officers. The investigator announced that they were conducting a drug interdiction and "asked everyone on board (approximately fifteen passengers) to produce bus tickets and identification. He then proceeded to the back of the bus to begin examining those items from each passenger."
Walking to the rear of the bus, the investigator observed defendant and a female companion, sitting in the last row of seats, push a black object between them. He approached the two individuals and asked for their identification and bus tickets. The investigator then obtained consent to search defendant's bag, which led to the discovery of a digital scale, and asked defendant and his companion to stand, at which time he saw a black jacket on defendant's seat. The officer found more than two ounces of cocaine in the jacket pocket.
Defendant was indicted on one count of criminal possession of a controlled substance in the second degree and one count of criminal possession of a controlled substance in the third degree. County Court denied defendant's motion to suppress the physical evidence seized by the police. Subsequently, defendant pleaded guilty to both charges and was sentenced as a second felony offender to concurrent prison sentences of 8½ years to life and 8½ to 17 years. The Appellate Division affirmed (274 AD2d 740), and a Judge of this Court granted defendant's application for leave to appeal (95 NY2d 891).
Defendant asserts that police conduct in this case violated the rules regulating police-initiated encounters with civilians as set forth in People v De Bour (40 NY2d 210) and People v Hollman (79 NY2d 181). At the outset, we note that whether police conduct in any particular case conforms to De Bour is a mixed question of law and fact (see, e.g., People v Battaglia, 86 NY2d 755, 756; People v Alvaranga, 84 NY2d 985, 986). Therefore, our review is limited to whether there is evidence in the record supporting the lower courts' determinations. Here we conclude there is not.
*525 Where police acting in their criminal law enforcement capacity initiate an encounter with private citizens, the propriety of the encounter must be assessed under the four-tiered analytical framework articulated in De Bour and reaffirmed in Hollman:
"If a police officer seeks simply to request information from an individual, that request must be supported by an objective, credible reason, not necessarily indicative of criminality. The common-law right of inquiry, a wholly separate level of contact, is `activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion.' Where a police officer has reasonable suspicion that a particular person was involved in a felony or misdemeanor, the officer is authorized to forcibly stop and detain that person. Finally, where the officer has probable cause to believe that a person has committed a crime, an arrest is authorized" (People v Hollman, 79 NY2d, at 184-185 [internal citation omitted], quoting People v De Bour, 40 NY2d, at 223).
It is well settled that when an officer asks an individual to provide identification or destination information during a police-initiated encounter, the request for information implicates the initial tier of De Bour analysis (see, e.g., People v Hollman, 79 NY2d, at 190-191). Although police officers have "fairly broad authority" to approach and pose questions, they may not do so on mere "whim or caprice"; the request must be based on "an articulable reason not necessarily related to criminality" (id., at 190).
The resolution of this case depends on when De Bour scrutiny was triggered and if, at that time, the police had an objective, credible reason to justify the request that all passengers produce tickets and identification. The People contend that the police did not approach any particular passenger until the investigator observed defendant and his companion secret a black object, which provided the investigator with an articulable reason to request information from defendant and his companion. But starting De Bour analysis at this juncture overlooks the fact, as found by County Court and the Appellate Division, that the investigator initially asked every one of the passengers to present documentation prior to any observations of passenger conduct. De Bour was triggered at that point. The *526 Appellate Division held that this inceptive request was "satisfied by the articulable reason that the officers were conducting drug interdiction on a commercial passenger bus traveling from New York City, a known source city for narcotic drugs" (People v McIntosh, 274 AD2d, at 741-742). Defendant argues that law enforcement knowledge regarding the origination of the bus was inadequate to establish a legal basis to ask everyone traveling on the bus to produce identification and a bus ticket. We agree with defendant.
We have never held that a police encounter was justified by anything so general as knowledge that an entire city is a known source of drugs. Even a discrete area of a city identified as a high crime area has not, by itself, been sufficient justification for informational requests of the type involved here. For example, in People v Hollman (79 NY2d, at 192-193), an undercover narcotics officer at the Port Authority Bus Terminal in New York City observed an individual and his companion standing 10 feet apart for several minutes with a bag between them. The officer watched as this person boarded a bus and placed the bag several seats away, and then saw him push his companion's bag closer to his. These actions were deemed to provide the police with an objective credible reason for approaching the two men (see, id., at 193). In People v Reyes (83 NY2d 945, 946, cert denied 513 US 991), this Court held that a police officer's request to stop was permissible where a person "was observed in a `drug-prone' area walking away from a group of men and clutching the inside of his jacket beneath his armpit as a marked police van approached." Similarly, the act of a person carrying "an apparently heavy, though not full, travel bag" while "walking in unison, as if marching in formation" with others in "an area known for its narcotics and weapons activities and the subject of a precinct alert that day" also warranted a police approach in Matter of James R. (76 NY2d 825, 826). And in People v De Bour, we held that police officers legitimately approached and inquired about a person's identity where "[t]he encounter * * * occurred after midnight in an area known for its high incidence of drug activity and only after [the individual] had conspicuously crossed the street to avoid walking past the uniformed officers" (40 NY2d, at 220 [internal citation omitted]).
The events in all of these cases occurred in vicinities classified by police as "drug-prone" or with a high incidence of crime. Notably, we did not base our holdings on this factor alone. In determining the legality of an encounter under De Bour and *527 Hollman, it has been crucial whether a nexus to conduct existed, that is, whether the police were aware of or observed conduct which provided a particularized reason to request information. The fact that an encounter occurred in a high crime vicinity, without more, has not passed De Bour and Hollman scrutiny (cf., People v Holmes, 81 NY2d 1056, 1058).
A request for information might be justified, for instance, if the officers had a "tip" or information that drugs were being transported from New York City by bus that evening (see, People v Alvaranga, 84 NY2d, at 986), or if the police had observed defendant engaged in certain activity prior to boarding the bus and then questioned him on the bus (see, People v Hollman, 79 NY2d, at 192-193). Similarly, if the police had information that a fugitive was in the terminal, that could warrant the questioning of passengers. De Bour, in short, does not prevent police officers from following up on leads or from requesting information in countless situations where there is an objective, credible reason to question a person.
Here, the record does not reflect any reason for the request of all passengers to produce their tickets and identification, other than the fact the bus had departed from a place described by the investigator as "known as a source city for narcotics." In the absence of any conduct by a passenger or other basis giving rise to a particularized reason for the encounter, the request of 15 passengers to produce documentation did not meet the De Bour standard.
Nor does the investigator's observation of defendant pushing a black object legitimize his earlier request of all passengers. Since a police encounter cannot be validated by a later-acquired suspicion (see, People v De Bour, 40 NY2d, at 215-216), the investigator's subsequent observations of defendant do not cleanse the initial request of its shortcomings under De Bour and Hollman.
We conclude that the procedure employed by three police officers in boarding the bus and requesting that all of the passengers produce tickets and identification was conducted without an objective, credible reason. It follows that the ensuing search of defendant's bag and jacket was unlawful. In light of our determination, we need not consider defendant's remaining constitutional challenges.
Accordingly, the order of the Appellate Division should be reversed, defendant's guilty plea vacated, his motion to suppressgranted and the indictment dismissed.
*528 SMITH, J. (concurring).
On January 23, 1997, about 3:30 A.M. three police officers boarded a bus in Albany, New York and announced that they were conducting a drug investigation. Without reasonable suspicion, they demanded the identification and bus tickets of all of the passengers. No one was told that he or she had a constitutional right to refuse the request. The sole reason for this conduct was that the bus had arrived from New York City which, according to the officers, was a major source of drugs. I agree with the majority that the police had no right to demand that everyone produce identification and a bus ticket. I also conclude that the defendant's Federal and State constitutional rights were violated.
The facts indicate that the police boarded the bus, announced a drug interdiction investigation and told everyone to produce identification and a ticket. Specifically, a police officer at the suppression hearing testified, "I announced we were from the Sheriff's Department, we were conducting interdiction, we were looking for contraband, I would like to see everyone's identification and bus ticket." One officer approached the defendant and his companion who were seated in the back of the bus. Another officer stood midway of the bus and the third officer stood at the door. One officer stated that he saw the defendant and his companion push down on a black object located between them. When the officer approached the two people in the back of the bus, they told him that they had tickets but no identification. When both looked away from the officer, he asked them a second and then a third time to produce identification and tickets. The third time, the two produced tickets. The testimony of the officer was that both persons volunteered that the officer could look in their bag. When the officer removed the bag from the compartment near the seat, the officer asked if they would consent to his looking in the bag. When they both replied affirmatively, the officer looked in the bag and found a scale. He then asked both persons to stand up and requested to search defendant's jacket. Defendant consented and a ball of cocaine was found. The two were arrested and defendant, after the denial of his motion to suppress, pleaded guilty to criminal possession of a controlled substance in the second and third degrees.
In his omnibus motion, defendant asserted that the police conduct violated his common-law rights, as well as both the *529 Federal and State Constitutions.[*] Specifically, defendant argued that he was seized in violation of the Fourth Amendment, that defendant did not feel free to disregard the police commands (citing People v Hollman, 79 NY2d 181, 194, which cited Florida v Bostick, 501 US 429, 434) and that his consent was involuntary and invalid.
The initial encounter was contrary to the police conduct permitted by People v De Bour (40 NY2d 210). De Bour describes four categories to evaluate police conduct when approaching a citizena request for information, a common-law right to inquire, a stop based on reasonable suspicion in accordance with Criminal Procedure Law § 140.50 (1) and an arrest based on reasonable cause (40 NY2d, at 227). The minimal intrusion of approaching to request information is permissible when the police have some objective, credible reason for the interference. In People v Hollman (79 NY2d 181, 189-190), this Court further explicated the first prong of the De Bour analysis, stating "that even in their law enforcement capacity, police officers have fairly broad authority to approach individuals and ask questions relating to identity or destination, provided that the officers do not act on whim or caprice and have an articulable reason not necessarily related to criminality for making the approach." Here, the sole reason for boarding the bus, confronting passengers and conducting this random suspicionless search was that the bus was coming from New York City, a locale where drugs exist and eight million people live.
The result of approving the conduct here would be that any person leaving New York City on a bus or train would be subject to being stopped by the police and requested to produce identification and a ticket indicating his or her destination. Consequently, people riding public transportation departing or arriving from New York City would be subject to indiscriminate police inquiry so long as the stated purpose for the intrusion was to investigate for drugs.
Furthermore, the fact that the officer approached the defendant and saw the defendant push something down, does not provide a basis for the officer to demand to search or to conduct a search of a bag. In People v Saunders (79 NY2d 181), this *530 Court refused to permit a search of a bag on consent when a police officer observed conduct that he thought was suspicious, namely that the defendant appeared nervous, looked around the area and gave his place in line to another passenger. Similarly, the defendant's behavior did not warrant a search of his bags and defendant's alleged consent was both involuntary and the result of unconstitutional police conduct (see, People v Gonzalez, 39 NY2d 122).
This case is akin to a checkpoint stop of vehicles for the investigation of drug activity, a procedure found violative of the Fourth Amendment in City of Indianapolis v Edmond (531 US 32), decided after the hearing in this case. In Edmond, the Supreme Court reiterated that such stops had to be based on reasonable suspicion:
"We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes. We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime" (531 US, at 44).
In Florida v Bostick (501 US 429), the Supreme Court indicated that pursuant to a program adopted by a Florida county, police had a right to board a bus and ask a particular individual, not the entire assembly of passengers, for identification and a ticket. In that case, the police officers, who were engaged in a drug interdiction program, told Bostick before they searched his luggage that he had the right to refuse consent. The Supreme Court addressed the limited issue of whether "a police encounter on a bus of the type described above necessarily constitutes a `seizure' within the meaning of the Fourth Amendment" (id., at 433). In remanding the case for further proceedings, the Supreme Court stated that the appropriate inquiry on whether Bostick had been seized was not whether he felt free to leave but whether, considering all of the circumstances of the encounter, "the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter" (id., at 439).
Here, when the officers boarded the bus and demanded that all of the travelers produce identification and tickets without telling them that they had a right to refuse, positioned *531 themselves in three places in the aisle and persisted in questioning the defendant after he tried to ignore them, their conduct was arbitrary and constituted a seizure of the defendant in violation of the Fourth Amendment and article I, § 12 of the New York State Constitution. That seizure had to be supported by reasonable suspicion.
In sum, the police conduct violated defendant's common-law rights and his constitutional rights under the Fourth Amendment and article I, § 12 of the State Constitution.
Order reversed, etc.
NOTES
[*] Article I, § 12 of the New York State Constitution reads, in part, the same as the Fourth Amendment and states "[T]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."