OPINION OF THE COURT
Norman J. Felig, J.
The defendant, Paul Barnes, and one Lee Kelly were indicted for the crime of murder in the second degree. The case was subsequently severed as to Kelly who pleaded guilty and is awaiting sentence. Defendant Barnes moved to suppress any evidence of his identification as one of the perpetrators of the crime. A pretrial Wade hearing was granted (United States v Wade, 388 US 218). At the conclusion of the hearing, the defense, for the first time, raised the issue of probable cause as to the defendant’s arrest and its effect upon any subsequent identification of the defendant as one of the perpetrators of the crime charged. The defendant, relying on the recent Supreme Court decision in Dunaway v New York (442 US 200), argued that if it should develop that the police did lack probable cause, unless the taint of the unlawful arrest was attenuated, evidence as to the identification of the defendant should be suppressed. In Dunaway, the Supreme Court decided the question of the legality of custodial questioning where there was less than probable cause for the initial arrest. The case at bar would appear to be the first *78 case where Dunaway is to be applied to an issue of identification. Without deciding the questions raised by the defendant, this court believed that an evidentiary inquiry into the lawfulness of the police conduct was warranted (see People v Misuis, 47 NY2d 979). The hearing was reopened.
THE HEARINGS
THE INITIAL HEARING
Louis Pittman, Watson Pittman and Jimmy Mason testified that on the evening of July 13, 1978, they were on the corner of Quincy Street and Nostrand Avenue. At about 1:00 a.m. they observed three men walking toward them. Louis and Watson Pittman recognized two of the men, who were holding the third man between them, as the two men they saw "play boxing” in the street earlier that evening. One of them grabbed the man in the middle around the neck and dragged him back into a hallway; the other man began punching him while he was being held. It was not until the punching stopped that Louis and Watson realized that the puncher had a knife and that he was stabbing the victim. James Mason never saw the knife. The victim, later identified as Izell Hough, received multiple stab wounds which resulted in his death.
Immediately following the incident, Louis and Watson Pittman went to the 79th Precinct where they looked through books of mug shots, but did not make any identification. Upon leaving the precinct they went to a grocery store where they recognized the two perpetrators from earlier that evening. The two men were discussing the incident. The "holder” asked the "stabber” whether he felt bad about what he had done. The "stabber” answered that if he had to he would do it again.
On July 18, Detective Paul Maurice, assigned to investigate the homicide, showed the Pittmans books of mug shots. Watson Pittman identified a man named George Bullock as one of the perpetrators. Louis Pittman identified a picture of the codefendant, Lee Kelly, as the stabber. Although the picture of the defendant, Paul Barnes, was directly beneath that of Lee Kelly, neither of the Pittmans picked it out.
On August 15, 1978 Detective Maurice seized Paul Barnes on Nostrand and Lexington Avenues, handcuffed him and *79 brought him to the 77th Precinct. Although the detective testified that he only brought Barnes in for investigation and that he was free to leave, he never informed Barnes of this.
Later that evening at the station house, the Pittmans were shown photographs on an array, prepared by the detective, containing 16 photos and a page from a mug shot book containing 11 photos. Each contained one photograph of Barnes and one of Kelly. Neither of the Pittmans were able to pick out any photos from the array of 16, although both identified a photo of Lee Kelly as the stabber from the mug shot book. They again failed to identify a photo of the defendant Barnes, although there was one in each group. A lineup was then conducted. Both Pittmans identified the defendant in the lineup as the stabber.
Louis Pittman testified that after viewing the lineup he changed his mind about who the stabber was because the photos that he was shown were in black and white and he had difficulty distinguishing the features. He stated that the hair of the stabber was short, which is similar to the length of Kelly’s hair as it appears in the picture and that the defendant Barnes has a lot more hair and looks healthier in the photo than on the night of the incident. Assistant District Attorney Groman testified that the photo in the array is only accurate as to Barnes’ face structure but not as to his hair and mustache, and the photo in the mug shot book is of Barnes at a younger age.
On Agugst 17, James Mason identified Lee Kelly as the holder and the defendant Barnes as the puncher from the photos in the mug shot book.
During the hearing, both of the Pittmans made an in-court identification of the defendant as the stabber. James Mason was unable to make an in-court identification but identified a photograph of the individual who he alleged did the punching. This was not a photo of Kelly or of Barnes.
Based on the evidence adduced at the hearing, this court rendered an oral decision which, in essence held: (1) that the pictorial and corporeal viewings of the defendant were not tainted by any impermissible police activity or conduct so as to result in a misidentification and (2) that the in-court identifications were based upon the witnesses’. independent recollection. The motion to suppress the identification was denied.
*80 THE REOPENED HEARING
The additional issue of whether there was probable cause for the arrest of the defendant Barnes was raised at the conclusion of the hearing by the defense attorney during the course of his argument citing Dunaway (442 US 200, supra). This court granted the motion to reopen the hearing and recalled its decision. Detective Maurice was recalled and testified that on July 15, 1978, he attempted to locate witnesses in the area in which the alleged homicide occurred. On Quincy Street between Nostrand and Marcy Avenues, he was approached by an elderly woman who asked him if he was a detective and if he was trying to find out what took place around there in the last couple of days. She stated that although she did not see anything, the people he wanted were Lee Kelly and Paul Barnes. The woman would not identify herself and walked away. The detective stated that he attempted to follow her, but lost her. He did not learn her name or where she lived. Subsequently, the detective went to the 79th Precinct where an officer told him that Kelly and Barnes "hung out together.”
Detective Maurice testified that the initial description of the perpetrators was taken by two other officers directly after the occurrence. In a police report made by Detective Ebert, perpetrator No. 1, the stabber, is described as a male, black, approximately 23 years old, 6 feet 2 inches tall, slim, with a short Afro; and perpetrator No. 2, the holder, is described as a male, black, 21 years old, 5 feet 7 inches tall, about 135 pounds, short Afro, blue jumpsuit, red stripes, blue T-shirt, white sneakers, and a K-5 knife. There is no indication in the report as to who gave these descriptions. A police report made by Detective Navarro contains the same descriptions which were given to him by Louis Pittman.
On July 18, the Pittmans gave Detective Maurice a description of the perpetrators. They described the person who held the deceased as about the same height as the deceased and the stabber or puncher as a few inches taller, dark skinned, with a close-cropped Afro haircut. Detective Maurice made a report with Louis Pittman’s description of perpetrator No. 1, the stabber, as male, black, in his 20’s, 5 feet 9 inches tall, 150 pounds, with "black” hair, and perpetrator No. 2, the holder, as male, black, in his 20’s, 5 feet 7 inches tall, 150 pounds, with black hair.
The detective testified that when the Pittmans viewed the books of mug shots on July 18, they stated that they had *81 problems with the black and white photos, saying that some looked light and others dark. They stated that they could be sure they were picking the right man if they could see him in person. Louis Pittman identified Lee Kelly from a page in the mug shot book. Watson Pittman identified a photo of George Bullock. The detective was unsuccessful in his attempt to locate Bullock and never received any more information connecting him to this incident. The detective testified that the photo of the defendant Barnes was underneath that of Kelly’s but was not identified.
A few days prior to the arrest on August 15, 1978, the detective had a conversation with Barnes on the corner of Nostrand and Lexington Avenues. He testified that he stopped his car and asked the defendant his name; whether he lived in the area and whether he knew Lee Kelly. The defendant replied that he did not have to tell the detective anything. He did tell him that his name was Eddie or Edward; that he lived in the area and did not know Kelly. At this point the detective took no official action against the defendant.
Detective Maurice testified that the defendant Barnes and Lee Kelly were taken into custody between 5:30 and 6:00 p.m. on August 15, 1978. The detective and his partner, without their guns drawn, approached the defendant and Kelly, who were standing in a group of four or five people on the corner of Nostrand and Lexington Avenues. Detective Maurice identified himself and told Kelly and Barnes that he was taking them to the station house. Kelly asked what it was all about. The detective told him to get into the police car and he would tell him. Kelly got into the car. Barnes asked where he was going, why he was going, and what it was all about. The detective told him that it was about a robbery and told him to get into the police car. Barnes then asked if he was being taken "just like that.” The detective told him yes; Barnes said "O.K.” and got into the car. Detective Maurice handcuffed the two together but did not search them; and took them to the 77th Precinct. He does not remember saying anything to either Barnes or Kelly in the car. At the precinct, the two were placed in separate rooms and handcuffed to a chair.
Later that evening the Pittmans identified a photo of Lee Kelly as the stabber; neither identified a photo of Barnes. The detective then informed the defendant that they were going to have á lineup. The defendant consented to stand in the lineup stating that he did not do anything. At about 10:30 p.m. the *82 Pittmans viewed the lineup separately and each identified the defendant Barnes as the stabber.
The detective testified that later the same evening he told Lee Kelly that the defendant had implicated him as the stabber in the incident, which was untrue. Kelly then requested to speak to Assistant District Attorney Groman and told him that Barnes was the stabber and that all he had done was hold the victim. At 11:30 p.m., Assistant District Attorney Groman questioned the defendant for the first time. The defendant denied participation in the crime.
THE ISSUES
The evidence adduced at the hearings clearly established that the defendant was initially taken into custody without probable cause. The District Attorney commendably concedes as much. Had the defendant made an inculpatory statement at the station house, whether to Detective Maurice or Assistant District Attorney Groman, Dunaway (442 US 200, supra) would be applicable and such statement would be suppressed unless there was an attenuation of the taint. During the defendant’s illegal detention, however, identification procedures, photographic and corporeal were employed. As stated above, there were two identifications of the defendant as one of the perpetrators of the crime charged: (a) in the lineup, and (b) an in-court identification at the hearing.
This raises several issues which the court must decide in light of Dunaway.
(1) Should the rationale of Dunaway as to the requirements of probable cause for the initial arrest and attenuation of the taint be extended to identification issues?
(2) If it should, was there an intervening factor which would attenuate the taint of the illegal arrest?
(3) Assuming the lineup identification is rendered infirm because Dunaway is applicable and there was no attenuation, is there evidence of independent source or should the in-court identification be suppressed?
I. APPLICABILITY OF DUNAWAY
A. PROBABLE CAUSE
In the Dunaway case, the defendant was taken into custody without probable cause. He was brought to the precinct, given *83 his Miranda warnings (Miranda v Arizona, 384 US 436), and then underwent custodial interrogation, which resulted in a confession. The Court of Appeals previously held that custodial questioning, where a suspect was detained upon a reasonable suspicion for a reasonable period of time, was permissible under the Fourth Amendment (People v Morales, 42 NY2d 129, cert den 434 US 1018). At the defendant Dunaway’s trial for attempted robbery and felony murder, the Monroe County Court denied the defendant’s motion to suppress his confession and he was convicted. The conviction was affirmed by the Appellate Division and the Court of Appeals (People v Dunaway, 42 AD2d 689, affd 35 NY2d 741). The Supreme Court granted certiorari (Dunaway v New York, 422 US 1053), vacated the judgment and remanded the case to the Court of Appeals for further consideration in light of its supervening decision in Brown v Illinois (422 US 590). The Court of Appeals (People v Dunaway, 38 NY2d 812) remitted the case to the County Court, which conducted a supplementary suppression hearing and held that Dunaway’s motion to suppress should have been granted. The Appellate Division reversed, relying on the Court of Appeals decision in Morales (supra) (People v Dunaway, 61 AD2d 299). The Court of Appeals dismissed Dunaway’s application for leave to appeal (44 NY2d 930). The Supreme Court again granted certiorari and reversed, holding that when there is no probable cause for an arrest, a confession must be suppressed unless there is an intervening factor which would attenuate the taint (Dunaway v New York, 442 US 200, supra).
The Supreme Court emphasized that any detention, regardless of its label, which is more than the brief Terry v Ohio (392 US 1) "stop”, must be based on probable cause. Although Dunaway’s seizure was not technically labeled an arrest, it amounted to the type of intrusion protected under the Fourth Amendment and for which probable cause is necessary. Since there was no probable cause for Dunaway’s arrest, the confession obtained from him would have to be suppressed unless there was attenuation of the initial taint. The Supreme Court found there was none and ordered the confession suppressed.
The holding in Dunaway was a reflection of two prior cases decided by the Supreme Court. (Brown v Illinois, 422 US 590, supra; Davis v Mississippi, 394 US 721.) In all three cases, the investigatory detentions, which were held to be indistinguishable from a formal arrest, led to custodial interrogation. Does *84 this mean that the rationale of Dunaway is limited to the situation where the arrest leads only to custodial interrogation?
The defendant in the case at bar was seized, handcuffed and taken into custody, all without probable cause. At the precinct he was confined to a room in which he was handcuffed to a chair for four and one-half hours. He was then placed in a lineup where he was identified by two witnesses. Prior to the lineup, the defendant had not been identified as one of the perpetrators.
The prosecution urges this court not to extend Dunaway to the instant situation because it would restrict the investigatory function of law enforcement. They contend that without an identification, probable cause for an arrest is usually found to be lacking. Therefore, if Dunaway was extended to this situation, probable cause would be needed to put an individual in a lineup, thus creating a "catch-22” situation. Does this mean that when an investigation is stalemated, it gives the police sufficient reason to encroach upon an individual’s constitutional rights? I think not: because, if that were allowed, there would be a prolificacy of unwarranted seizures in the hope that something would turn up. It was just this type of police conduct which Mapp v Ohio (367 US 643) and its progeny was supposed to discourage and deter. In fact, it is the deterrent effect of the exclusionary rule which our Court of Appeals has stated in its "single-most, if not sole” justification (People v McGrath, 46 NY2d 12, 31, cert den 440 US 972; see, also, People v Boodle, 47 NY2d 398, 404; People v Tindal, 69 AD2d 58, 61).
The function of the Fourth Amendment is to give individuals protection against unwarranted intrusion by the State. The defendant’s arrest and more than four-hour detention was an unreasonable invasion of his constitutional rights. Detective Maurice’s testimony that the defendant was free to leave, although he never informed him of this, is immaterial. The defendant was physically restrained. There is no question in this court’s mind that Dunaway requires probable cause whenever a seizure amounts to more than the Terry v Ohio "stop”, regardless of the purpose of the detention. There is no doubt that the defendant’s seizure and detention in the absence of probable cause was a Fourth Amendment violation.
In Davis v Mississippi (394 US 721, 727, supra), the Supreme Court stated that detentions for the sole purpose of *85 obtaining fingerprints are subject to the constraints of the Fourth Amendment. The Supreme Court noted, however, that (supra, p 727) "because of the unique nature of the fingerprinting process, such detentions might, under narrowly defined circumstances, be found to comply with the Fourth Amendment even though there is no probable cause in the traditional sense.” (Emphasis supplied.) The Davis court never had to reach the issue of what a "narrowly defined circumstance” actually meant because the defendant was subjected not only to fingerprinting but to custodial interrogation.
Although a lineup, like fingerprinting, does not involve a search or interrogation and, unlike a confession, is not testimonial evidence, the court in Davis specifically distinguished lineups and confessions from fingerprinting. The court held (supra, p 727) that fingerprinting is an "inherently more reliable and effective crime-solving tool than eyewitness identifications or confessions and is not subject to such abuses as the improper line-up and the 'third degree.’ ” (Emphasis supplied.) By making this distinction and noting that lineups can be subjected to abuses, this court believes that "narrowly defined circumstances” would not be applicable to the lineup situation. Probable cause is needed at all times.
It is also important to note the dicta in Dunaway (442 US 200, 213, 214, supra): "In effect, respondents urge us to adopt a multifactor balancing test of 'reasonable police conduct under the circumstances’ to cover all seizures that do not amount to technical arrests. But the protections intended by the Framers could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases, especially when that balancing may be done in the first instance by police officers engaged in the 'often competitive enterprise of ferreting out crime.’ Johnson v. United States, 333 U.S. 10, 14 (1948). A single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront. Indeed, our recognition of these dangers, and our consequent reluctance to depart from the proven protections afforded by the general rule, is reflected in the narrow limitations emphasized in the cases employing the balancing test. For all but those narrowly defined intrusions, the requisite 'balancing’ has been performed in centuries of precedent and is embodied in the principle that seizures are *86 'reasonable’ only if supported by probable cause.” (Emphasis supplied.)
This court subscribes to the principle that it is essential to have only one standard to govern all seizures and that standard has been long established; seizures are reasonable provided they are supported by probable cause.
B. ATTENUATION
Since the unlawful arrest in the case at bar led to a lineup and not to an interrogation, must the identification at the lineup be suppressed if there is no intervening factor to attenuate the taint?
Citing Schmerber v California (384 US 757, 764), the Supreme Court in United States v Wade (388 US 218, 223) held that an involuntary blood test did not violate the Fifth Amendment privilege against self incrimination, because that amendment only protects against compulsion to give "testimonial or communicative” evidence. Federal and State courts have usually held that the Fifth Amendment "offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture.” (Schmerber v California, supra, p 764.) Compulsion which makes a suspect or accused the source of real or physical evidence does not violate it. Merely exhibiting one’s self for observation by witnesses involves no compulsion to give knowledge of a testimonial nature.
Since the Fifth Amendment privilege against self incrimination does not extend to the lineup situation, at first blush it would appear that the identification of the defendant at the lineup would be admissible.
In Schmerber (supra), the defendant was arrested at a hospital while receiving treatment for injuries suffered in an accident involving his automobile. A police officer directed a doctor to withdraw a blood sample from his body. The analysis of the sample revealed the percentage of alcohol in his blood which indicated intoxication. He was later convicted of the criminal offense of driving an automobile while intoxicated.
Schmerber contested the legality of the receipt of the analysis into evidence on the ground that the blood sample had been taken without his approval. His contention was that he *87 was denied his Fourteenth Amendment right of due process, his Fifth Amendment right against self incrimination, his Sixth Amendment right to counsel, and his Fourth Amendment right protecting him against unreasonable searches and seizures. As stated above, the Supreme Court found no violation of Schmerber’s rights, holding that the taking of a blood sample involves no testimonial compulsion.
The defendant in Schmerber, however, was a suspect, under arrest, and he did not contest the legality of his arrest. Similarly, in Wade, the defendant was first indicted and then arrested. A lineup was ordered 15 days later. The court held that the lineup did not violate the defendant’s Fifth Amendment privilege against self incrimination. However, the defendant Wade was more than a suspect at that time, he was formally accused.
The defendant in the case at bar was illegally detained and has contested the legality of his arrest. Was Barnes, at the time he was seized, even a suspect? Prior to his seizure Barnes had not been identified although his pictures were viewed by witnesses. The only evidence connecting Barnes with the homicide was Detective Maurice’s testimony concerning his conversation with an unknown elderly woman who vanished into thin air. Assuming the court were to give credence to that testimony, there was no reasonable basis for concluding that Barnes was a suspect as contemplated by the Supreme Court in Wade (supra).
Can Schmerber and Wade be reconciled with the case at bar where there was a clear Fourth Amendment violation? I think not, especially in light of Justice Brennan’s caveat in Schmerber (384 US 757, 772, supra): "we reach this judgment only on the facts of the present record. The integrity of an individual’s person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual’s body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.”
This court today most assuredly has before it a substantial intrusion "under other conditions.” Since unlike Schmerber and Wade our defendant was illegally seized and detained when there was no reasonable basis for believing him a suspect can it be argued that placing him in a lineup under these conditions would be permitted by the Constitution as a minor intrusion? This court holds that it cannot. Therefore, *88 there must be an attenuation of the primary taint (Dunaway v New York, 442 US 200, supra). It has long been held that compliance with an individual’s other constitutional rights (Fifth, Sixth, and Fourteenth Amendments) does not attenuate a Fourth Amendment taint (Brown v Illinois, 422 US 590, supra). The police may not pick up a person without any articulable reason and put him in a lineup, even though there may be no Fifth Amendment violation.
In Matter of Mackell v Palermo (59 Misc 2d 760), the court held that it was without power to issue an order directing a lineup where the defendant was a mere suspect and where there was no probable cause warranting an arrest. The court stated that the fact that the defendant was in custody on an unrelated charge was immaterial.
In a recent case, the Appellate Division, First Department, in People v Pickett (71 AD2d 575) found that the lineup was lawfully conducted where the defendant was in custody and his arrest was based on probable cause.
The case of People v Vega (51 AD2d 33) can also be compared to the instant case. Vega was placed in a lineup in Queens County while he was confined in the Bronx House of Detention on an unrelated charge. He was not in custody in Queens County nor named in any accusatory instrument in Queens County. The main issue in Vega revolved around the compulsory shaving of the defendant’s beard before he appeared in the lineup. This dealt with a procedure which would invade the defendant’s constitutional right to determine his physical appearance.
The court found that the fact the defendant was in custody on another charge was immaterial. It held that it must first be determined whether there was probable cause to arrest the defendant or to obtain an accusatory instrument before it would even consider whether there was justification for the shaving of the defendant’s beard.
The case of People v Delgado (97 Misc 2d 716) has been distinguished from Vega (supra). The court held that Delgado’s Fourth Amendment rights were not violated where he was ordered to shave his beard and appear in a lineup when he was under indictment.
In the case at bar, where the defendant was unlawfully arrested and then placed in a lineup while unlawfully de *89 tained, an attenuation of the taint must be found or the lineup identification suppressed.
II. WAS THERE AN INTERVENING FACTOR TO ATTENUATE THE TAINT OF THE ILLEGAL ARREST?
The Supreme Court in Dunaway held that unless there was some intervening factor to attenuate the taint of the illegal arrest, the defendant’s confession must be suppressed. The court found no attenuation and held that even though proper Miranda warnings were given which made the statements voluntary for Fifth Amendment purposes, this was only a "threshold” condition. "No intervening events broke the connection between petitioner’s illegal detention and his confession. To admit petitioner’s confession in such a case would allow 'law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the "procedural safeguards” of the Fifth’ ” (Dunaway v New York, 442 US 200, 219, supra).
The Dunaway court followed the test designed by Brown v Illinois (422 US 590, supra) to determine whether the confession was obtained by exploitation of an illegal arrest. Brown held that in order to use the statements, the prosecution must show not only that the statements meet the Fifth Amendment voluntary standards, but also that the causal connection between the statements and the illegal arrest is sufficiently broken to purge the primary taint of the illegal arrest in light of the Fourth Amendment.
The factors set out by Brown, as applicable to the case at bar, are: (1) the temporal proximity of the illegal arrest and the identification; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct.
The prosecution has the burden of showing that the lineup identification in this case is admissible. The threshold question is whether anything occurred between the time of the illegal arrest and the lineup to cause the defendant to reasonably believe that he was not in custody and free to leave the station house.
Up until the lineup was conducted, the defendant had not been identified by anyone as one of the perpetrators nor did the detective have any other information to warrant even *90 a reasonable suspicion that the defendant participated in the commission of the crime. Had Detective Maurice indicated to the defendant that he had some choice, i.e., that he was free to go or to stand in the lineup, this court could then determine that the connection between the illegal detention and the lineup identification was broken. Although the detective did ask the defendant whether he would stand in a lineup, the defendant had no reason to believe he could refuse. The record established that in the four and one-half hours that elapsed between the arrest and the lineup there was "no intervening event of significance whatsoever” (Brown, supra, p 604). Moreover, as in Brown and Dunaway "the arrest without probable cause had a 'quality of purposefulness’ in that it was an 'expedition for evidence’ admittedly undertaken 'in the hope that something might turn up.’ ” (Dunaway, supra, p 218).
It could be argued that the defendant consented to stand in the lineup. Detective Maurice testified that the defendant agreed to participate in the lineup; that the defendant stated that he did not do anything and that the defendant picked his number and the position in the lineup. Under all the attendant circumstances, did the defendant voluntarily consent to the lineup?
The People have a heavy burden of proving the voluntariness of a consent when a defendant is in custody (People v Gonzalez, 39 NY2d 122). Gonzalez held that (supra, p 128) "the immediate events of an arrest * * * engender an atmosphere of authority ordinarily contradictory of a capacity to exercise a free and unconstrained will”.
It has been held that in determining what the circumstances are "the subjective beliefs of the defendant are not to be the determinative factor. The test is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant’s position.” (People v Yukl, 25 NY2d 585, 589, cert den 400 US 851.) This court finds that under all the attendant circumstances a reasonable person in the defendant’s position would have believed himself to be in custody. Therefore, when the defendant was asked to participate in the lineup, his assent was not the exercise of a "free and unconstrained will”. This court, therefore, holds that the defendant did not voluntarily consent to stand in the lineup.
The court having found that the taint of the illegal arrest and detention was not attenuated and that the defendant’s *91 consent to stand in the lineup was not voluntary, evidence of the defendant’s identification in the lineup must be suppressed.
III. IN-COURT IDENTIFICATION
Having suppressed the evidence of the lineup identification, the final issue to be determined is whether the in-court identification of the defendant, during the hearing, is admissible.
Our courts have permitted evidence of in-court identifications based on independent source even though these identifications may have been preceded by other improper identification procedures which had been suppressed (People v Lloyd Winston G., 45 NY2d 962; People v Ramos, 42 NY2d 834; People v Ballott, 20 NY2d 600; People v Coleman, 66 AD2d 982).
The courtroom identification is not admissible unless the People can establish by "clear and convincing evidence” that the witnesses’ identifications have an independent source, i.e., that they are based on observations of the defendant other than in the lineup (United States v Wade, 388 US 218, 240, supra; People v Ballott, supra; People v Brown, 20 NY2d 238, cert den 390 US 928; People v Coleman, supra).
On the evidence adduced, this court finds that Louis and Watson Pittman had ample opportunity to observe the defendant prior to, during and subsequent to the incident. The evidence is clear and convincing that there is an independent source for the in-court identification of the defendant.
The motion to suppress is granted as to the lineup identification and is denied as to the in-court identification.