OPINION OF THE COURT
Joseph Jaspan, J.
The primary question presented here is whether the exclusionary rule should be invoked in a case where the police acting in good faith made a judgmental error in relying on defendant’s apparent consent to search the trunk of an automobile parked in a public place.
Subsidiary issues exist with respect to the interpretation of People v Boodle (47 NY2d 398), and People v Middleton (54 NY2d 474), and as to statements attributed to the defendant.
*122 In denying the motion of defendant to suppress by applying a good-faith rule to “judgmental errors”, a distinction will be drawn between it and the good-faith “technical errors” rule adopted in United States v Williams (622 F2d 830, cert den 449 US 1127), under review by the Supreme Court of the United States in the case of People v Gates (82 Ill App 3d 749), and rejected in the New York Court of Appeals in People v Jennings (54 NY2d 518).
The terms are defined in the opinion which follows.
The defendant is charged with three counts of criminal possession of a weapon in the third degree; two counts of criminal possession of a weapon in the fourth degree; five counts of criminal possession of stolen property in the third degree and one count of bribery in the second degree.
He moves to suppress physical evidence seized at the time of his arrest and any custodial statements attributed to him.
A hearing was held on October 20, 1982 and continued on October 21,1982. It was reopened on November 3,1982 and continued on November 16,1982. The court makes the following findings of fact and conclusions of law.
FINDINGS OF FACT
On the morning of January 23,1982, Police Officer Gary F. Blind received a phone call at the Fourth Precinct, Hauppauge, from an unidentified male who reported that automatic weapons could be found in the trunk of a maroon Oldsmobile, license No. 1716AGB, then parked on Route 25A near “Silvestri’s Bar”.
Officers Tim Monahan and Jeff Mahon responded and staked out the vehicle. At approximately 2:35 a.m. they observed the defendant enter the car and followed him to the parking lot of the Octagon Bar in nearby Smithtown.
When the defendant exited the vehicle the officers approached him, identified themselves and requested his driver’s license and registration.
The defendant looked in his wallet but did not have either of these items but did give his name and date of birth. At the suggestion of the police officer that they might be in the glove compartment, the defendant used the *123 keys, entered that compartment and then produced the insurance card which bore the name Bove. The defendant stated this was his daughter, and in fact she was and lived at the same address as the defendant.
A computer check actually made at that time by Officer Monahan revealed that there were then two outstanding active warrants against the defendant, a Family Court warrant for nonsupport and a vehicle and traffic warrant for driving with a suspended license.
He was not handcuffed but was placed in technical custody because of the warrants. No Miranda warnings were given at this time and in fact it is not claimed that defendant made any statements with respect to the matters for which he was then arrested.
In pursuance of their suspicions based upon the phone tip, the police asked the defendant if he would open the trunk of the car. After some initial hesitation, the defendant complied, personally using the keys in his possession.
When the trunk was opened the police observed about 50 boxes of ammunition including 125 rounds of nine millimeter ammunition, a rifle case and a military camouflage top. When asked if he would open the gun case the defendant again complied revealing a loaded AR-15 semiautomatic rifle.
Upon moving the gun case a hand grenade was seen which eventually was proved to have been hollowed out.
The defendant was then handcuffed and Officer Monahan read him his Miranda warnings.
When asked if he wished to contact an attorney, the defendant answered “yes”, thereby invoking his right to counsel.
The officer nevertheless continued to read the last question on the plastic card uniformly used by the police and asked if “Having these rights in mind, do you wish to talk to [me] now without a lawyer” to which he responded “The grenades are not mine. They were put in my trunk. Somebody’s got a contract on me” and he continued to make noninculpatory statements regarding an alleged attempt on his life. He then indicated that there was something else *124 in the vehicle and that if Officer Monahan would make it disappear, it would be “worth his while”. When the officer responded “What are you talking about”, defendant stated that there was a loaded .45 caliber handgun in a gym bag in the passenger compartment of the car.
Officer Monahan retrieved the gun and turned it over to Detective Foulke who had just arrived.
In the meantime, a friend of the defendant was permitted to call an attorney on the defendant’s behalf.
After receiving the handgun from Officer Monahan, Detective Foulke asked the defendant if he owned it and whether he had a permit. When told by the defendant that it was owned by him without a permit, he was again given his Miranda warnings. Immediately thereafter he again permitted a search of his trunk and warned the detective to be careful because somebody had tried to kill him.
This second search of the trunk revealed another gun case containing an Uzzi weapon and a box containing a grenade.
The parties have stipulated that the items which form the basis of the five counts of criminal possession of stolen property in the third degree were then also found in the trunk.
CONCLUSIONS OF LAW
The court notes at the outset that the defendant possessed standing to challenge the search of his daughter’s car which he had been driving with her consent (People v Regnet, 111 Misc 2d 105; see Rakas v Illinois, 439 US 128).
“[A] policeman’s right to request information while discharging his law enforcement duties will hinge on the manner and intensity of the interference, the gravity of the crime involved and the circumstances attending the encounter” (People v De Bour, 40 NY2d 210, 219).
In the absence of information as to the source of the tip the police officers could initially exercise the common-law right to ask the driver to identify himself. The information available at that time did not give evidence of probable cause to believe a crime had been committed (People v Elwell, 50 NY2d 231; People v Dinkins, 76 AD2d 655).
*125 The initial encounter was however within the permissible limits based upon a reasonable suspicion that defendant was engaged in criminal activity (People v Scruggs, 90 AD2d 520; People v Harrison, 57 NY2d 470). When the defendant could not produce a driver’s license or registration for the car, the police could make further inquiry (People v Wilson, 57 NY2d 786), and upon learning of the outstanding warrants, the defendant was properly arrested.
Since the arrest on outstanding warrants was lawful, the defendant was subject to a search and items within the “grabbable area” were subject to seizure (Chimel v California, 395 US 752). The search and seizure are prohibited only where, as in traffic violation cases, an arrest was not necessary because an alternative summons could be issued or because the arrest was a suspect pretext (People v Troiano, 35 NY2d 476, 478). Neither condition prevailed here.
The defendant’s vehicle was parked in a public place, a lot adjacent to a bar (People v Orlando, 56 NY2d 441, 445) and consequently a search of the passenger compartment would have been justified as an incident to the arrest under the automobile exception if there was reason to believe that a weapon would be discovered (People v Belton, 55 NY2d 49, 54).
A search of the passenger compartment was not then undertaken as an incident to the defendant’s arrest and the facts belie any police intention to do so. The attention of the police was directed first to the locked trunk of the vehicle without any demonstration of exigent circumstances (People v Mitchell, 39 NY2d 173) or of probable cause to believe the vehicle was transporting contraband (People v Orlando, supra).
In United States v Ross (456 US 798, 807, n 9) and People v Orlando (supra, p 446) decided shortly thereafter, the courts concluded that “‘if an individual gives the police probable cause to believe a vehicle is transporting contraband, he loses the right to proceed on his way without official interference’ ” and that since under those circumstances a vehicle may be searched, it justifies the search of every part of the vehicle and its contents.
*126 Thus in the absence of probable cause at that time, there was no legal right to search that trunk at the time the police asked the defendant if he would permit them to view its contents.
The People acknowledge the technical difficulties resulting from the search of the trunk before the search of the passenger area but urge that notwithstanding any judgmental error, the contents of the car should not be suppressed because (a) there was a valid consent to the search; (b) the car would, in any event, have been impounded and its contents inventoried and failing either of these claims; (c) the “good faith” exception to the exclusionary rule should be applied.
The People also claim that under the theory of People v Boodle (47 NY2d 398, supra), and People of Middleton (54 NY2d 474, supra), the handgun found in the passenger compartment and evidence of the offer of a bribe to police officers should not be suppressed.
THE ISSUE OF CONSENT. TO SEARCH
Consent may be established by an affirmative response, by word or deed (People v Whitehurst, 25 NY2d 389, 392) and it is to be determined by the “totality of the circumstances” (Schneckloth v Bustamonte, 412 US 218). But the burden rests heavily on the People to establish the voluntariness of the waiver (People v Whitehurst, supra).
The Court of Appeals in People v Gonzalez (39 NY2d 122) set forth four factors to be considered in determining the voluntariness of an apparent consent: (1) “whether the consenter is in custody or under arrest, and the circumstances surrounding the custody or arrest” (p 128); (2) “the background of the consenter” (p 129); (3) “whether the consenter has been, previously to the giving of the consents, or for that matter even later, evasive or un-cooperative with the law enforcement authorities” (p 129); and (4) “whether a defendant was advised of his right to refuse to consent” (p 130).
The defendant in this case was not under physical restraint at the time he was asked to open the trunk but he was nonetheless in custody and not free to leave at will. He was not advised of his right to withhold his consent and it *127 is not clear that, notwithstanding eight prior arrests, he was fully aware of his options in that regard. The defendant did appear to be acting in a spirit of co-operation notwithstanding the fact that he contemporaneously sought the immediate services of a lawyer.
There is some difficulty in understanding why the defendant would voluntarily consent to open the trunk of the car which contained ammunition, automatic weapons, an active hand grenade and stolen property consisting of a United States Government motor vehicle operator’s identification card, and six similar cards, in blank, a New York State operator’s license belonging to another and a Nassau County Sheriff’s badge.
It is possible that defendant was unaware of the contents of the trunk and hoped that by granting permission to the police to look inside he would divert attention from the passenger compartment where he had knowing possession of a .45 caliber handgun.
But that is retrospective speculation and is not a. sufficient predicate for a finding that the defendant “voluntarily consented” to the search of the trunk (People v Rivera, 90 AD2d 778).
While it cannot be said that the conduct of the police was overbearing (People v Kuhn, 33 NY2d 203, 208-209), the defendant may nevertheless have submitted to authority (People v Gonzalez, supra, pp 128-130; People v Gorsline, 47 AD2d 273) without giving expression to that fact by word or conduct.
In any event, the People have not proved beyond a reasonable doubt that the defendant knowingly waived his constitutional right to privacy as to the contents of the trunk.
THE RIGHT TO AN INVENTORY SEARCH
This issue must be considered under the circumstances which prevailed after the arrest of the defendant on the outstanding warrants for nonsupport and operating a motor vehicle with a suspended license which has been determined in this case to be prior to the search of the trunk.
People urge that the vehicle was then subject to impoundment and an inventory search leading inevitably to *128 the discovery of all of the weapons and other items which defendant seeks to suppress.
An inventory search may be conducted where there is concern for the safety of the general public who might be endangered if an intruder removed a revolver from a vehicle (Cady v Dombrowski, 413 US 433) or if it is conducted pursuant to standard police procedures and is designed to secure and protect the car and its contents (South Dakota v Opperman, 428 US 364) or to protect the police against claims or disputes over lost or stolen property (United States v Kelehar, 470 F2d 176, 178).
In People v Escalante (89 AD2d 1019) that defendant was also arrested for driving with a suspended license. The court held that the police were required to arrest him and that the consequent search of his car would have been justified on either of two grounds: (1) that probable cause to arrest for possession of a weapon still existed on the basis of information from a reliable source or (2) as a constitutionally permissible routine inventory search of an automobile subsequent to its lawful seizure.
By contrast in this case, the police had not made any timely election to impound and/or inventory the contents and gave no indication that they intended to do so. Nor is there any suggestion that it would have been routine to follow such procedure under the circumstances prevailing. In fact, Officer Monahan indicated to the defendant that he could be readily bailed out at the station house and appear in the court at a later date, implying that he would only be detained briefly and could then return to his car.
There was no expressed concern at that time or even retrospectively at this hearing about the possibility that intruders might reach weapons believed to be in the vehicle.
The conclusion here is that there were no circumstances existing before the search of the trunk which would justify an inventory search. Under the circumstances that search cannot be justified on that basis.
THE EXCLUSIONARY RULE
In Boyd v United States (116 US 616), the Supreme Court held that the admission at trial of evidence obtained in *129 violation of the Fourth Amendment would make proceedings unreasonable and illegal. Almost 30 years later in Weeks v United States (232 US 383, 393), the exclusionary rule and its rationale were expressed in this language: “If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution.”
Justice Louis Brandéis set forth the underlying theory in Olmstead v United States (277 US 438, 485), in these words: “If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.”
The exclusionary rule did not reach full bloom until 1961 when Mapp v Ohio (367 US 643) extended it to the States but exceptions were already being carved out, e.g., attenuation (Nardone v United States, 308 US 338).
By 1971 the call for re-evaluation was expressed in . Bivens v Six Unknown Named Agents of Fed. Bur. of Narcotics (403 US 388), and in Coolidge v New Hampshire (403 US 443).
Collateral attacks upon the rule have resulted in a long and complex series of rulings providing-exceptions on the basis of practicality and societal interests.
For example, searches may now be sustained under principles of attenuation (Nardone v United States, supra), the automobile exception (Arkansas v Sanders, 442 US 753), exigency (People v Mitchell, 39 NY2d 173), consent of a person with apparent authority (People v Adams, 53 NY2d 1), impoundment and inventory (South Dakota v Opperman, supra), administrative procedure (People v Rizzo, 40 NY2d 425), inevitable discovery (People v Fitzpatrick, 32 NY2d 499), plain view (People v Di Stefano, 38 NY2d 640), standing (People v Ponder, 54 NY2d 160), harmless error (People v Coles, 89 AD2d 471), stop and frisk (Terry v Ohio, 392 US 1), and within the recently enlarged “grabbable area” associated with a lawful arrest (New York v Belton, 453 US 454).
*130 The exceptions do not result from any charted course but reflect changing attitudes especially with respect to searches of automobiles in public streets.
The complexity of the legal and factual issues involved is further evidenced by the number of appellate reversals and the dissents among Judges of the same court.
For example, in the 1981-1982 session of the United States Supreme Court there were five reported opinions on searches and seizures. In four of these cases, one or both of the lower courts was reversed and in four of those opinions there were dissents. In the last two published volumes of opinions of the New York Court of Appeals (vols 55, 56) there are 14 reported decisions in this area. Of these, four resulted in reversals and one resulted in vacating the suppression pending a hearing and in three of these decisions there were dissenting opinions.
Justice Blackmun in his concurring opinion in United States v Ross (456 US 798, 825, supra) made a telling comment when he wrote: “My dissents in prior cases have indicated my continuing dissatisfaction and discomfort with the Court’s vacillation in what is rightly described as ‘this troubled area.’”
And yet the police, acting in good faith, and in pursuance of their professional duties may nevertheless find their work undone by retrospective examinations of their conduct after considerable and often intensive study of the fine points in the literature on the subject.
In the instant case the police officers acted in a public parking lot at 2:30 a.m. without benefit of counsel or time for legal research. They believed the quality of the consent to be sufficient to permit them to look into the trunk of a vehicle opened by the operator upon request without the exercise or threat of physical or psychological pressure, or the use of the power to command.
That decision is now deemed to have been a mistake only because the People have failed to prove beyond a reasonable doubt that the defendant knowingly waived a right and consented to the search as that phrase is interpreted in People v Gonzalez (39 NY2d 122, supra). It cannot be said under the circumstances of this case that the officers acted with a “white heart but an empty head”.
*131 Conduct must be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by experience and training. A Judge should tap the vein of common sense (United States v White, 648 F2d 29, 36-38, cert den 454 US 924).
The police had detailed information as to the vehicle, its registration and location, verified by appropriate surveillance and an articulable suspicion that it contained automatic weapons. They acted properly in determining that the defendant operator was the subject of active warrants and did not then possess a driver’s license or registration for the vehicle.
They asked the defendant if he would open the trunk as they were curious as to its contents and the defendant complied using his own key. This opinion now holds that while the consent lacked the quality to constitute a waiver of the right of privacy in that portion of the car, the police in good faith believed their conduct was proper and justified.
A judgmental error arises where the police hold a belief in good faith which is reasonable based upon an objective view of the circumstances present and not just on the subjective good faith of the searching officers (People v Adams, 53 NY2d 1, 9, supra). It is this type of error which is attributed to the police here as distinguished from the technical error rejected in People v Jennings (54 NY2d 518, supra).
In Jennings the police relied in good faith upon a warrant which was no longer outstanding, having been previously vacated by Supreme Court order. The arrest and the subsequent search were therefore invalid. The court rejected the People’s contention that the “good faith” reliance upon the parole warrant “hit” renders the exclusionary rule inapplicable, writing (p 523): “An assessment of probable cause turns on what was reasonably and objectively in the mind of law enforcement authorities. It does not turn on such subjective considerations as the absence of malice against a suspect, the lack of intent to violate constitutional rights (People v Adams, 53 NY2d 1, 9; Hill v California, 401 US 797, 804) * * * The good faith of the enforcement authorities cannot validate an arrest based upon a *132 warrant which had been vacated four months before and had been executed nine months before the arrest was made.”
Jennings thus applied the exclusionary rule to what has been defined as a technical violation in United States v Williams (622 F2d 830, 841, supra) which cites as examples reliance upon a statute which is later ruled unconstitutional, a warrant which is later invalidated or a court precedent which is later overruled.
Support for this distinction also comes from People v Adams (supra), which is cited and explained in Jennings.
The Adams court upheld a search where there was good-faith belief by law enforcement officials that permission to conduct that search was given by one with actual authority to consent, adding (53 NY2d, at p 9): “[I]f the police are acting in a reasonable fashion in response to the circumstances with which they are confronted, then an error in judgment in failing to ascertain the actual authority of the person to consent should not give rise to an unreasonable search.” (Emphasis added.)
But even the Jennings rule is now under collateral attack in the Congress (31 Crim L Rptr 2019, 2226) and before the United States Supreme Court in People v Gates (82 111 App 3d 749, supra). In these forums it is argued that the holding by the Fifth Circuit in United States v Williams (supra) which applies the goód-faith exception to both judgmental and technical errors, should prevail.
In Williams the defendant was free on bond conditioned that she remain within the State of Ohio. She was observed to deplane at Atlanta Airport on a nonstop flight from Los Angeles. She was arrested for violating bail requirements (US Code, tit 18, § 3146) and a search pursuant to that arrest revealed that she was in possession of heroin which was seized.
After indictment on that charge she moved to suppress the physical evidence.
The violation of the bond condition was not a criminal offense and therefore did not render the defendant subject to arrest or search.
*133 The court, sitting en banc, declined, to apply the exclusionary rule holding that when an officer acts in the good-faith belief that his conduct is constitutional and where he has a reasonable basis for that belief the exclusionary rule will not operate, even if it relates to a technical violation such as was involved in that case where the arrest lacked a valid predicate.
That ruling goes beyond the holding in Adams and the ruling in this case.
The exclusionary rule is not itself a requirement of the Constitution (Stone v Powell, 428 US 465, 482). It is a rule crafted to enforce constitutional requirements justified in the illegal search context only by its deterrence of future police misconduct and must be considered in the light of its direct effect of preventing the whole truth from being told and its by-products of freeing guilty criminals and endangering society (United States v Williams, supra, pp 841-842).
This concept that the court should weigh the societal interests against the limited benefit derived from the application of the exclusionary rule has been recently adopted by the New York Court of Appeals in People v Young (55 NY2d 419, 425), where it wrote: “The Supreme Court, however, has readily acknowledged that the exclusionary rule has never been interpreted to preclude the ‘use of illegally seized evidence in all proceedings or against all persons’ (United States v Calandra, supra, at p 348; see, also, United States v Ceccolini, 435 US 268, 275; Stone v Powell, 428 US 465,486). Noting that in some cases the societal costs of applying the exclusionary rule are too substantial when compared to limited benefits derived from it, both this court and the Supreme Court have held that the application of the rule must be restricted to those areas where its remedial objectives are most ‘efficaciously served’ and not merely ‘tenuously demonstrable’ (United States v Calandra, supra, at p 348; People v McGrath, 46 NY2d 12, 21). It is clear that the exclusionary rule has never been considered a fundamental right of constitutional dimensions requiring automatic application whenever .the Fourth Amendment has been violated. Rather, it has always been incumbent upon the courts to balance the *134 societal cost of losing reliable and competent evidence against the probable effectuation and enhancement of Fourth Amendment principles, for as our court unanimously found, the application of the exclusionary rule is dependent ‘upon a balancing of its probable deterrent effect against its detrimental impact upon the truth-finding process’ (People v McGrath, supra, at p 21).”
It is noted parenthetically that this ruling vests sufficient discretion in the trial court so that this court by its decision herein is not presumptuously trespassing on an appellate area as suggested by the defendant.
The conclusions to be derived from the foregoing analysis of the facts and the applicable law are:
(1) The police acted in good faith in relying upon defendant’s act of consent in opening the trunk and permitting them to look inside and only the strict application of the law with respect to burden of proof precluded a denial of the motion to suppress on that ground. The ruling as to consent is a marginal one in view of the diminished right of privacy in a vehicle parked in a public place.
(2) That the good-faith error was judgmental and does not warrant the application of the exclusionary rule. It provides even more compelling circumstances for the creation of an exception than that provided by United States v Williams (622 F2d 830, supra), and is not inconsistent with People v Adams (53 NY2d 1, supra).
(3) Further, the application of the balancing test in People v Young (supra), weighs heavily in favor of the societal interest in the prosecution of a person charged with possessing and transporting automatic weapons in a case involving a vehicle where there is a diminished right of privacy. A search of a home might alter the result of that balancing test.
(4) The judgmental error in the highly technical legal area involves no need for a deterrent penalty and the exclusionary rule should not be applied.
THE ALLEGED. BRIBERY OFFER AND RESULTING SEIZURE
After the defendant’s arrest on the active warrants and for possession of the weapons found in the trunk, defendant is said to have offered to make it “worth while” *135 for the officer if he made a .45 caliber handgun in the passenger compartment disappear. The subsequent search, now based upon probable cause, revealed the weapon which is the subject of Counts Nos. 1 and 2 of the indictment. Defendant was also charged with bribery in the second degree (Count No. 5).
Defendant contends that the “bribe offer” made after he requested an attorney must be suppressed and the search and seizure of the handgun was tainted by use of a proscribed statement and an alleged illegal search of the trunk.
A similar situation was considered in People v Middleton (54 NY2d 474, supra). The court there held that a person whose statements may be constitutionally protected does not get immunity for a new crime committed in the presence of a police officer where the conversation was initiated by the defendant. The bribe offer then furnished a valid independent basis for interrogation and investigation. It wrote (p 481): “[A] defendant who asks for counsel in one breath and then with the next, without awaiting the arrival of counsel and without provocation, makes a bribe offer, has shown that he views his need for an attorney as limited to the legal proceedings that will ensue and considers himself quite competent to seek an illegal end to his predicament.”
The police were under no obligation to limit their investigation as to the new crime after the bribe statement attributed to defendant. Additionally armed with “probable cause” they could then pursue the investigation by conducting the search for the subject weapon.
On October 14, 1982 in People v Mealer (57 NY2d 214), the Court of Appeals, citing Middleton specifically held that a suspect whose right to counsel has attached with respect to a past crime may be subjected to questioning outside the presence of counsel by police who are investigating a new crime in progress as long as the questioning is legitimately related to the new crime. Evidence thereby obtained, if not otherwise violative of the suspect’s rights, may be presented to prove the suspect’s guilt of the past crime.
*136 The “offer” was an independent act involving a calculated risk and is not regarded as a spontaneous reaction to an alleged unlawful search after a lawful arrest (People v Boodle, 47 NY2d 398, supra).
These conclusions do not depend upon the prior ruling that the search of the trunk was in any event lawful under the circumstances set forth above. But that conclusion further dissipates the force of defendant’s argument.
The motion to suppress the statement alleged to constitute a bribe offer and the weapon thereby discovered is denied.
OTHER ORAL STATEMENTS
The statements attributed to the defendant after the search of the trunk and before the “bribe offer” described herein as noninculpatory will be suppressed, if the defendant so insists.